**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

No. 95-5581

NORMAN HARRINGTON WILSON, a/k/a
Stormin Norman,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

No. 95-5582

WILLIAM DAVID WILSON, a/k/a
Pudgie,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

No. 95-5839

WILLIAM CORREY TALLEY, a/k/a Rat
Rat,
Defendant-Appellant.

Appeals from the United States District Court
for the Eastern District of North Carolina, at Fayetteville.
Terrence W. Boyle, Chief District Judge.
(CR-94-65-BO)

Argued: June 7, 1996

Decided: January 29, 1998

Before RUSSELL, WIDENER, and MICHAEL, Circuit Judges.

_____

Affirmed in part, vacated and remanded in part, and vacated and remanded in part with instructions by published opinion. Judge Michael wrote the opinion, in which Judge Russell and Judge Widener joined.

_____

## COUNSEL

**ARGUED:** Rudolph Alexander Ashton, III, New Bern, North Carolina, for Appellant Norman Wilson; Wayne Buchanan Eads, Raleigh, North Carolina, for Appellant William Wilson; Alexis Christopher Pearce, Raleigh, North Carolina, for Appellant Talley. John Howarth Bennett, Assistant United States Attorney, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Janice McKenzie Cole, United States Attorney, Raleigh, North Carolina, for Appellee.

_____

## OPINION

MICHAEL, Circuit Judge:

Norman Wilson, his brother William Wilson, and William Talley appeal their convictions for several offenses relating to drug trafficking. We vacate Talley's convictions and remand his case for a new trial because of prosecutorial misconduct during closing argument. Talley was not on trial for murder, and the evidence was insufficient to permit the inference that he had committed murder. Nevertheless, the prosecutor, in an eleventh hour surprise at summation, told the jury that Talley had murdered a man, and that improper argument prejudiced Talley to the point of denying him a fair trial. As to Norman Wilson we remand with instructions to vacate his conspiracy conviction and its related sentence because conspiracy is a predicate offense for his continuing criminal enterprise conviction. We affirm Norman Wilson's other convictions and both of William Wilson's convictions.

2

I.

The conspiracy count in the thirteen-count indictment charged that Ronald Perkins and appellant Norman Wilson "supervised and controlled an organization known as the `Grove View Terrace Court Boys,' which controlled the distribution of crack cocaine in the Grove View Terrace housing project" in Fayetteville, North Carolina, from 1988 until late 1994.[1] Perkins and Norman Wilson were also charged with operating a continuing criminal enterprise (CCE) through an extended series of drug trafficking violations. The eleven remaining counts charged other alleged co-conspirators, including appellants William Wilson and Talley, with various drug or weapons violations.

Perkins began cooperating with the government after he was arrested. He signed a plea agreement and testified, as the government's main witness, against the two Wilsons and Talley, who were tried together. Perkins testified that he and Norman Wilson were partners and co-managers of the Court Boys drug ring. Perkins was responsible for obtaining wholesale supplies of powder cocaine, and Norman Wilson was in charge of cooking the cocaine into crack, packaging it, and distributing it to street dealers. Perkins identified Talley as one of the organization's street dealers, and he said that Norman Wilson "sometimes" gave William Wilson crack to sell. Other witnesses, who admitted their involvement with the Court Boys organization and who were testifying for the government under plea agreements, implicated the Wilsons and Talley in varying degrees. We will discuss the evidence in greater detail as it becomes pertinent to the issues raised.

The jury convicted Norman Wilson of operating a CCE, see 21 U.S.C. § 848, conspiracy to possess with intent to distribute crack cocaine, see 21 U.S.C. § 846, and using or carrying a firearm during and in relation to a drug trafficking crime, see 18 U.S.C. § 924(c). He was sentenced to concurrent life terms on the conspiracy and CCE convictions and to sixty months consecutively on the § 924(c) convic-

_____

[1] It was alleged that most of the members of the Perkins-Norman Wilson drug ring grew up in the Grove View Terrace project, which consists of a group of apartment buildings surrounding a central courtyard, hence the name "Court Boys."

3

tion. William Talley was convicted of conspiracy to possess with intent to distribute crack cocaine and on a § 924(c) firearms violation. In addition, Talley was convicted of possession with intent to distribute crack cocaine, although this was later changed to a powder cocaine conviction. See 21 U.S.C. § 841(a)(1). He was sentenced to concurrent life terms on the conspiracy and possession convictions and to sixty months consecutively on the § 924(c) conviction. William Wilson was convicted of conspiracy to possess with intent to distribute crack cocaine and on a § 924(c) firearms violation. He was sentenced to 300 months in prison for the conspiracy conviction and sixty months consecutively on the firearms conviction. The two Wilsons and Talley now appeal.

II.

A.

We turn first to Talley's main contention. Talley was not on trial for murder, and there was no evidence that he had actually killed anyone. The prosecutor waited until closing argument to contend that Talley had murdered a man in a drug deal that turned sour. Talley asserts that the murder argument, a last-minute surprise that went beyond the evidence, was prosecutorial misconduct that deprived him of a fair trial. We agree.

Two members of the Court Boys drug ring testified about an incident at Grove View Terrace when Talley attempted to make a drug sale from the curb into a car. According to one of the witnesses, the man in the car "snatched something" from Talley. J.A. 283. After the car pulled away, Talley, who had a gun, fired at it. Neither witness was sure that the car had been hit: one said he"d[id] not know if [Talley] hit it," id., and the other said the car "slowed down . . . like it had been hit" and then "wobbled on out" or"pulled on out [of] the projects." J.A. 374. The next morning the witnesses saw the car over a bridge embankment ("in the grassy part," J.A. 284) about a half mile from Grove View Terrace.[2] The first witness testified that he was "not sure what happened to the guy" in the car. J.A. 284. When the prose-

_____

**2** Talley's lawyer either objected to or moved to strike all of this testimony.

4

cutor asked the second witness, "What happened to the driver?", J.A. 374, the trial judge sustained an objection, and the question went unanswered. As a result, there was no testimony about the driver's fate. Specifically, there was no testimony that a body had been recovered or that the driver of the car had received, much less died of, gunshot wounds.

This lack of evidence of a death, however, did not stop the prosecutor from arguing (over objection) in his initial closing and again in rebuttal that Talley had murdered the driver of the car. Moreover, when the prosecutor made this argument, he knew (but had not disclosed to defense counsel) that another person had been convicted in state court of murdering the same man.

The prosecutor made the murder argument as follows during his initial closing argument:

> THE PROSECUTOR: Ladies and gentlemen, you heard Ronald Perkins talk about, as time went by, the escalation in violence in and around Grove View Terrace. You heard him talk about that and how more shootings and craziness -- I think he used that word. The guns were just getting worse; it was getting a lot more violent. And you heard Steve Evans [sic] and Kelly Debnam talk to you about one incident in particular involving Mr. Talley. A car came into Grove View Terrace. That was commonplace; people could drive in and drive right up to people, buy crack cocaine.

> MR. PEARCE [Counsel for Talley]: Objection.

> THE COURT: Overruled.

> THE PROSECUTOR: A car came in, and something happened. Most likely, from what the witnesses testified, the person buying the drugs was probably trying to rip Mr. Talley off, get some drugs and not pay him and everything.

> MR. PEARCE: Objection, Your Honor.

> THE COURT: Overruled.

5

THE PROSECUTOR: How did Mr. Talley respond? He pulled out his gun, he shot at that car, the car lurched forward a little bit and kind of slowed down, came, turned out of the projects, a couple hundred yards down the street went down the road off the embankment. Ladies and gentlemen, what do you think happened to the driver of that car? What do you think happened to the driver of that car? What happened is that William Talley shot him dead.

MR. PEARCE: Objection, Your Honor.

THE COURT: Overruled.

THE PROSECUTOR: He killed that man that night for ripping him off for drugs.

MR. PEARCE: Objection.

THE COURT: Overruled.

J.A. 519-20.

During his closing argument Talley's lawyer reminded the jury that Talley was not on trial for murder and that there was no evidence of murder. The matter did not end there, however. During the final moments of his rebuttal argument the prosecutor returned to the subject:

THE PROSECUTOR: Two more things to sort of close it up. One is back to Mr. Talley. Ladies and gentlemen, two witnesses have come in here and testified somebody drove into Grove View Terrace, engaged in some sort of transaction with Mr. Talley. The car pulled away, and Mr. Talley fired at the car. The car slowed down, halted, pulled out of the project, and was seen -- the car was over in the ditch.

MR. PEARCE: Objection to this whole line, Your Honor.

6

THE COURT: The alleged shooting, is that what you're arguing about?

THE PROSECUTOR: Yes, sir.

MR. PEARCE: Yes, sir.

THE COURT: Overruled.

THE PROSECUTOR: And that car was found several hundred yards or so away, just outside the project, over an embankment. You draw your own conclusions about what happened. Use your common sense, but two witnesses have testified Mr. Talley fired at that car. And then as to what happened to that car or that vehicle right afterwards.

J.A. 561-62.

B.

Our circuit has a two-pronged test for determining whether a prosecutor's misconduct in closing argument "`so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637 (1974)). Specifically, a defendant "must show [1] that the [prosecutor's] remarks were improper and [2] that they `prejudicially affected the defendant's substantial rights so as to deprive [him] of a fair trial.'" United States v. Adam, 70 F.3d 776, 780 (4th Cir. 1995) (quoting United States v. Mitchell, 1 F.3d 235, 240 (4th Cir. 1993)); accord United States v. Francisco, 35 F.3d 116, 120 (4th Cir. 1994); United States v. Brockington, 849 F.2d 872, 875 (4th Cir. 1988).

1.

We turn first to whether it was improper for the prosecutor to argue precipitously in summation that Talley "shot [a man] dead" for snatching some drugs. The government contends that the murder argument was fair comment on admissible evidence of Talley's gun

7

use. According to the government, Talley's firing of the gun after the curbside incident "was an integral part of the charged conspiracy." Appellee's Br. at 32.[3] We agree that this evidence of Talley's gun use was admissible because it arose out of the alleged conspiracy. See United States v. Morgan, 117 F.3d 849, 861 (5th Cir. 1997). But that does not mean it was proper for the prosecutor to use this evidence in final argument to press a claim of murder against Talley.

The murder argument is problematic for several reasons. First, the argument was not based on record evidence or any reasonable inference that could be drawn from it. The evidence was simply that (1) Talley shot at the car as it drove away, (2) the car slowed down "like it had been hit," "wobbled," then drove out of Grove View Terrace, and (3) the car was found later, about one-half mile away, off the road in the grass. While this evidence may have been sufficient to support the inference that Talley's gunfire hit the car, or perhaps that a shot struck the driver, it is not enough to suggest that the driver died as a result of any gunshot from Talley. There was no evidence of the condition of the car, for example, no evidence of bullet holes in the passenger compartment and no evidence of blood. Finally, there was no evidence that a body had been recovered; indeed, there was no hint of what had become of the driver.

This complete lack of evidence about what happened to the driver meant that the government did not prove a death, the first element of the corpus delecti.[4] Because the government did not establish a corpus

_____

[3] The government did not rely on this alleged gun use to charge Talley under § 924(c).

[4] The corpus delecti for murder is (1) a death (2) by unlawful conduct. See United States v. Russell, 971 F.2d 1098, 1110 n.22 (4th Cir. 1992). Of course, the prosecution may establish the corpus delecti by circumstantial evidence. See id. at 1110-12. In a circumstantial case of murder there must still be proof of the victim's death, such as a lengthy disappearance or the extreme loss of blood. In other words, the inference of death must have a reasonable basis in the facts. See, e.g., id. (victim disappeared); Epperly v. Booker, 997 F.2d 1, 7-8 (4th Cir. 1993) (victim's blood found, and she had disappeared); see also Virgin Islands v. Harris, 938 F.2d 401, 408-15 (3d Cir. 1991) (surveying cases). Because there was no evidence here that fairly suggested that the driver had died, an

delecti, the prosecutor could not fairly argue that Talley murdered the driver of the car. By saying that Talley had murdered a man, the prosecutor asserted something as fact that had not been proved, and that was clearly improper. By going outside the evidence, the prosecutor "violated a fundamental rule, known to every lawyer, that argument is limited to the facts in evidence." United States ex rel. Shaw v. De Robertis, 755 F.2d 1279, 1281 (7th Cir. 1985). Of course, a prosecutor may argue that the evidence gives rise to an inference, but the suggested inference must be reasonably drawn from the facts in evidence. See United States v. Brainard, 690 F.2d 1117, 1122 (4th Cir. 1982). Here, there was no basis from direct fact or reasonable inference for a murder argument.

Second, the prosecutor asked one witness what happened to the driver, and the trial judge refused to allow an answer. Thus, the prosecutor argued that Talley had killed the driver, knowing very well that he (the prosecutor) had not been permitted to introduce any evidence of the driver's fate. It is well settled that a prosecutor cannot argue facts that were excluded from evidence by the trial judge. See United States v. Small, 74 F.3d 1276, 1282 (D.C. Cir. 1996).

Third, the murder argument came as a last-minute surprise. Talley was not charged with murder in the indictment, and the testimony about his shot at the car did not translate into notice that it would be used as the predicate for a murder claim. As we just mentioned, there was no evidence that the driver had died of a gunshot inflicted by Talley. Indeed, the judge had pointedly excluded any evidence of what happened to the driver. As a result, neither Talley nor his lawyer could have been expected to understand that the prosecutor would make a claim of murder in summation. They were blindsided when it was too late to investigate the matter and present a defense.

_____

inference of death was not reasonable. Cf. Lavender v. Kurn, 327 U.S. 645, 653 (1946) ("Whenever . . . the evidence is such that fair-minded men may draw different inferences, [it is the jury's] duty to settle the dispute by choosing . . . the most reasonable inference. Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear.").

9

Indeed, if there had been the opportunity, it appears that Talley's lawyer could have developed a defense. Another man had been convicted in state court for murdering the driver of the car -- a fact that the prosecutor knew when he told the jury that Talley had shot and killed the driver. However, the prosecutor did not disclose this state murder conviction to the defense, and Talley's lawyer did not learn about it until after trial. Even if Talley knew about the state conviction, the murder claim initiated at closing came too late for Talley's lawyer to develop a factual defense based on any information Talley might have had.**5**

We conclude that the prosecutor's murder argument was highly improper because it was not supported by the evidence and it was sprung at the last minute, when Talley and his lawyer had no chance to investigate the charge or to offer any evidence in defense.

2.

That brings us to the second prong of the test -- whether the defendant's substantial rights were prejudiced to the point of denying him a fair trial. Several factors are relevant to the determination of prejudice, including:

> (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters.

_____

**5** If Talley did not know about this piece of exculpatory and impeachment evidence before trial, the prosecutor's final argument was improper for another reason. Because the prosecutor knew that a man was in prison for the murder, but did not disclose that fact to the defense, he would have violated his duty under Brady v. Maryland, 373 U.S. 83 (1963), and United States v. Bagley, 473 U.S. 667 (1985), to inform the defense of any material exculpatory or impeachment evidence. Cf. United States v. Zackson, 6 F.3d 911, 918 (2d Cir. 1993) (explaining that evidence is not "suppressed" for Brady purposes when defendant knew or should have known about it).

10

Adam, 70 F.3d at 780 (quoting United States v. Harrison, 716 F.2d 1050, 1052 (4th Cir. 1983)); Mitchell, 1 F.3d at 241-42 (same). We also consider (5) whether the prosecutor's remarks were invited by improper conduct of defense counsel, see United States v. Young, 470 U.S. 1, 12-13 (1985), and (6) whether curative instructions were given to the jury, see Harrison, 716 F.2d at 1053. These factors are examined in the context of the entire trial, and no one factor is dispositive.

a.

We begin the prejudice analysis by assessing the degree to which the prosecutor's remarks misled the jury and prejudiced Talley. It was extremely misleading for the prosecutor to tell the jury that Talley killed a man "for ripping him off" in a drug deal, when there was no evidence of death or life-threatening injury. By forcefully stating an unreasonable inference, the prosecutor was making the misleading suggestion to the jury that it could draw the inference that Talley was a murderer. See 1 ABA Standards for Criminal Justice 3-5.8(a) (3d ed. 1993) ("The prosecutor should not intentionally . . . mislead the jury as to the inferences it may draw.").

We also believe that the prosecutor's murder argument was prejudicial to Talley. First, it is hard to fathom anything more prejudicial than the unproved assertion that the accused is also guilty of the uncharged crime of murder while he is on trial for another offense. See United States v. Bradley, 5 F.3d 1317, 1321 (9th Cir. 1993) (evidence of an uncharged homicide was "highly and unfairly prejudicial"). Our society reserves its severest condemnation for murderers. Murder is a crime "regarded by public opinion as involving moral turpitude," Restatement (Second) of Torts § 571 (1977), which "means, in general, shameful wickedness, so extreme a departure from ordinary standards of honesty, good morals, justice or ethics to be shocking to the moral sense of the community," id. at cmt. g. Here, there is a serious risk that the jury decided to convict Talley simply because it believed he was a murderer, not because it weighed the evidence for proof of drug conspiracy and possession, the crimes actually charged. See United States v. Pirovolos, 844 F.2d 415, 426 (7th Cir. 1988) ("Any implication that a criminal defendant is guilty of uncharged offenses unfairly encourages the jury to find the defendant guilty because of his or her bad character, rather than because the evi-

11

dence warrants a guilty verdict."). Second, the prosecutor's unforeseen claim of murder was prejudicial because it came at a point when it could not be countered with a factual defense. Talley's lawyer did all he could in the circumstances by arguing that Talley was not on trial for murder. But because of the last-minute nature of the charge, Talley's lawyer was deprived of any chance to learn about and present what could have been the best defense: that someone else had been convicted for the murder.[6] Finally, Talley was prejudiced by the murder remarks because he did not know that the testimony of Perkins and Debnam, the two witnesses who discussed his shot at the car, would be used to establish him as a murderer. Because the murder assertion came well after Perkins and Debnam were off the stand, Talley had no opportunity to cross-examine them about any murder claim.

_____

[6] As we understand the government's position, it does not contend that the person in state prison was Talley's accomplice in murdering the driver of the car. At oral argument we asked the prosecutor why he accused Talley of murder when he (the prosecutor) knew someone else had been convicted in state court. The prosecutor repeatedly replied, "We believed our witnesses." The government's theory that Talley was acting alone was revealed in the sentencing process. The government objected to the presentence report because the probation officer had not included murder as part of Talley's offense conduct. The government "contend-[ed] that the evidence at trial indicated that Talley was responsible for a homicide in Grove View Terrace when a cocaine base customer tried to short-change [him]." J.A. 645. At the sentencing hearing the district judge questioned the case agent about the government's murder contention. The agent said that Talley was the "[o]nly shooter." J.A. 107. According to the agent, the car Talley shot at was seen the next day "a mile or so from the Grove View Terrace area," id., and a man was found in the car, dead from a bullet wound. The agent had no evidence that the bullet matched Talley's gun. Finally, the agent admitted, "We had an individual from that area that was convicted in state court of that murder." Id. After considering the matter, the district judge refused to attribute any murder to Talley for sentencing purposes.

Talley should not be accused, much less sentenced, for the uncharged crime of murder on the theory that he was the "only shooter" unless he has the chance to show that someone else, such as the man who was already convicted for the crime, did it.

12

b.

The second factor relevant to the prejudice determination is whether the remarks were isolated or extensive. The prosecutor's argument that Talley was a murderer was not isolated; instead, it was prominent and thoroughly developed. In both his initial closing argument and in his rebuttal the prosecutor painted in detail a scene of Talley killing someone over a drug deal turned sour. The prosecutor began the murder argument with a reference to the trial testimony of Perkins and Debnam. He recounted for the jury Perkins and Debnam's testimony about Talley firing at a car that was later found off the road. The prosecutor then said: "What do you think happened to the driver of that car. What happened is that William Talley shot him dead . . . . He killed that man that night for ripping him off for drugs." J.A. 520. Thus, the prosecutor pitched the murder argument as if there was specific trial testimony to support it. Moreover, in the closing minute or two of his rebuttal -- the last argument the jury heard -- the prosecutor said he had one more thing about Talley "to sort of close it up." J.A. 561. The prosecutor's final point about Talley was to accuse him again of murder. The prosecutor urged the jury, "Use your common sense" and "draw your own conclusions" about what happened after "Mr. Talley fired at that car." J.A. 562. That was the last thing the jury heard from the lawyers about Talley.

The prosecutor's murder argument and the Perkins-Debnam testimony about the shot at the car were extensive in the context of what was offered against Talley in this relatively short trial. The entire trial testimony, which covered three defendants and eight charges, took only about eight hours. Accordingly, this is not a case where the effect of improper conduct was diluted by days of testimony and argument about other matters.

c.

We next examine the strength of the competent proof against Talley on the drug possession and conspiracy charges, putting aside the prosecutor's improper comments.[7] Although Talley had $1,500 in

_____

[7] We will not go into detail about the evidence against Talley on the § 924(c) gun charge because that charge falls if its predicate offense

13

cash when he was arrested, he did not have any drugs. Thus, the only evidence against Talley on the possession count came from the testimony of Perkins, the convicted (but unsentenced) leader of the Court Boys organization. On direct examination Perkins testified that shortly before his arrest Talley gave him a quarter kilogram of powder cocaine. Perkins said he himself hid the cocaine "in the woods for a while" and was "working on selling it" right before he was arrested. J.A. 215. On cross-examination Perkins reiterated that he did not sell this cocaine before he was arrested, although he said, "I could have." J.A. 261. In the next breath, however, Perkins said he did give Talley "some [$4,000] of the money off of it," indicating that a portion had been sold. J.A. 261. Perkins's testimony on cross and redirect contains other contradictions. He was asked on cross where the quarter kilogram was located, and he answered, "Ask Norm[Wilson] . . . [c]ause . . . I gave him the drugs when I buy 'em." J.A. 261. On redirect Perkins confirmed that when he "bought . . . powder cocaine, . . . no matter what quantity, no matter when it was," he gave it to Norman Wilson, who was solely responsible for cooking, packaging, and distributing the crack product to street dealers. J.A. 285.

Perkins was the key witness against Talley on the conspiracy charge. Perkins's conspiracy testimony against Talley was not extensive, but it was direct. Perkins testified that for several years he sold $1,000 packages (forty "rocks") of crack cocaine to Talley, who was a street dealer. Perkins said that Talley got as "much as he could sell" and that it took him three to four hours to sell forty rocks. J.A. 185-86. Talley's lawyer did not directly challenge this testimony on cross-examination. Instead, he had Perkins explain that he was testifying under a plea agreement. Perkins admitted that after he was arrested he tried to get the best deal he could and that he was cooperating with the government to avoid a life sentence.

We do not believe it was readily apparent during Perkins's testimony that the prosecutor was using Perkins to lay out a circumstantial case of murder against Talley. Thus, Talley's lawyer had no reason

_____

(conspiracy) falls. We do note that the gun charge had nothing to do with the shooting incident that led to the murder argument. Instead, it related to a gun found under the passenger seat of Talley's car right after his passenger (and alleged co-conspirator), James Rodney Smith, was arrested.

14

to try to establish on cross-examination that Talley was not a murderer. The lack of notice on the true purpose of Perkins's testimony concerning Talley's shot at the car effectively shielded Perkins from any cross-examination on the point that someone other than Talley might have murdered the man.

There was other evidence of Talley's involvement in the drug conspiracy. Earl Thornton, Perkins's principal supplier, who had received a ten-year sentence that he hoped to get reduced by cooperating, also testified against Talley. Thornton said he sold 500 grams of cocaine directly to Talley in 1989 and made other sales again in 1993. Steve Evans, who admitted to delivering packaged crack to street dealers for Perkins and Norman Wilson, said he had delivered packages of crack to Talley, but not "that . . . often." J.A. 338. Richard Whitlock said he sold crack alongside Talley and others in Grove View Terrace. J.A. 410. Evans and Whitlock also were aiming to get a lighter sentence by cooperating and testifying.

In sum, the possession case against Talley was weakened somewhat by Perkins's defensiveness and inconsistency on cross-examination. The conspiracy case was strong, but Talley was deprived of the chance to develop and use the best ammunition (that someone else committed the murder) to cross-examine the main witness about what the prosecutor improperly highlighted as evidence of murder.

d.

We now turn to whether the prosecutor deliberately placed the murder argument before the jury to divert its attention to extraneous matters. When the prosecutor detailed his case against Talley through the direct examination of his first (and principal) witness, Perkins, there was no mention whatsoever of Talley shooting at a car after a curbside drug deal went awry. It was only after Perkins stumbled on cross-examination that the prosecutor began redirect by asking Perkins about Talley's gun use on that occasion.[8] Later, the prosecutor

_____

[8] Although the questioning of Perkins about the shooting incident went beyond the scope of cross-examination, it was allowed over the objection of Talley's lawyer.

15

covered the same incident with direct testimony from another witness, Debnam. The trial judge, however, refused to let Debnam testify about what happened to the driver of the car. In all events, the prosecutor had plenty of time to consider whether to turn the "shot at the car" testimony into a murder charge against Talley. After Debnam testified, there was an intervening night, another day of trial and a second intervening night before closing argument. The murder argument therefore was not a comment made in the heat of the moment. Instead, it appears to have been a deliberate, calculated decision to assert facts not in evidence in order to divert the jury from the real issues in the case.

e.

The next factor, whether the prosecutor's remarks were invited by the conduct of defense counsel, may be dealt with quickly. There is simply no hint in the record that defense counsel did anything to invite the prosecutor to say Talley was a murderer.

f.

Finally, we ask if any curative instructions were given to the jury. In his charge the trial judge did remind the jury that the defendants were not on trial for charges not alleged in the indictment. A short time earlier, however, the trial judge twice overruled defense counsel's objection to the prosecutor's fully developed argument that Talley committed murder. In the circumstances, we believe that the general instruction was insufficient to cause the jury to disregard the specific argument that Talley was a murderer.

g.

After considering all of these factors, we conclude that the prosecutor's improper closing remarks "prejudicially affected [Talley's] substantial rights so as to deprive [him] of a fair trial." Mitchell, 1 F.3d at 242 (internal quotation marks and citation omitted). We reach this conclusion fully recognizing that the drug trafficking evidence against Talley was strong (see II.B.2.c., supra ). The problem is that the prosecutor did not stop with just that evidence. He engaged in a significant

16

diversion with the argument that Talley was a murderer. That argument was extraneous and indefensible overkill that we cannot write off as harmless. The prosecutor insisted to the jury that Perkins and Debnam had provided substantive evidence of murder with their testimony that Talley shot at a car. But this testimony did not reasonably support an inference that Talley had killed the driver. Moreover, as we have said, the murder accusation came as a last-minute surprise after it was too late for Talley to develop and offer a factual defense, a defense that appeared to be available. The prosecutor's methods and argument have caused most of the factors in the prejudice equation to weigh heavily against the government. As a result, we believe the risk is too great that Talley was convicted because the jury thought he was a murderer, a reason wholly irrelevant to his guilt or innocence on the charges in the indictment. We therefore reverse Talley's convictions on all counts and remand for a new trial as to him.

III.

We now examine the contentions of the other two defendants, beginning with Norman Wilson's challenge to his conviction and sentence for engaging in a continuing criminal enterprise (CCE) in violation of 21 U.S.C. § 848.

A.

Norman Wilson argues that there is insufficient evidence to support his CCE conviction. The government must prove the following five elements on a CCE charge:

> (1) defendant committed a felony violation of the federal drug laws; (2) such violation was part of a continuing series of violations of the drug laws; (3) the series of violations were undertaken by defendant in concert with five or more persons; (4) defendant served as an organizer or supervisor, or in another management capacity with respect to these other persons; and (5) defendant derived substantial income or resources from the continuing series of violations.

United States v. Ricks, 882 F.2d 885, 890-91 (4th Cir. 1989). Norman Wilson focuses just on the fourth and fifth elements, arguing that the evidence was insufficient as to them. We disagree.

17

In reviewing the sufficiency of the evidence on a criminal conviction, we must sustain the jury's verdict "if there is substantial evidence, taking the view most favorable to the Government, to support it." Glasser v. United States, 315 U.S. 60, 80 (1942).

The fourth CCE element calls for a defendant to be an organizer, supervisor, or manager. Norman Wilson contends that the evidence at best established that he was just one of many sellers for Ronald Perkins. Perkins and his suppliers were the organizers and managers, according to Wilson. We must give CCE's management requirement a "common-sense reading," bearing in mind that the statute "is designed to reach the `top brass' in the drug rings, not the lieutenants and foot soldiers." Garrett v. United States , 471 U.S. 773, 781 (1985). Perkins testified that he and Norman Wilson were in the drug business together for over nine years. Steve Evans, Kelly Debnam, and Michael Whitlock all testified that they sold crack for Norman Wilson, and they each named other persons who also sold crack for Wilson. Perkins, Earl Thornton (the principal supplier of crack to the Court Boys organization), and Steve Evans all identified Norman Wilson as Perkins's partner. Perkins said, "I would basically go get the cocaine. I always been the one to go get it. And when I'd get it I'd give it to Stormy [Norman Wilson], and he'll handle it from there." J.A. 177. These facts provide substantial evidence that Norman Wilson was one of the "top brass" in the organization.

Norman Wilson also claims a failure of proof on the fifth CCE element, contending there was no evidence that he received substantial income or resources from a series of drug trafficking violations. In essence, Norman Wilson claims that he earned no more than street level sellers. Perkins, however, testified that he and Norman Wilson could make $60,000 to $70,000 profit on each kilogram of powder cocaine they bought. For a time Thornton supplied the organization with at least one kilogram a week. This is sufficient to prove that Norman Wilson derived substantial income from a series of drug trafficking violations.

Accordingly, we reject Norman Wilson's sufficiency-of-the-evidence challenge to his CCE conviction.

18

B.

Norman Wilson next asserts, and the government agrees, that his conviction for conspiracy to possess with intent to distribute crack must be vacated because the conspiracy was expressly alleged and proved as a predicate offense for his CCE conviction. The parties are correct. A defendant convicted under 21 U.S.C. § 848 (CCE) cannot, in addition, be convicted for any predicate conspiracy charges proved as elements of the § 848 offense. Rutledge v. United States, 116 S. Ct. 1241 (1996); United States v. Johnson, 54 F.3d 1150, 1162-63 (4th Cir. 1995). Accordingly, we remand to the district court with instructions to vacate Norman Wilson's conspiracy conviction and his resulting sentence on that count.

C.

Norman Wilson also argues that the life sentence he received for his CCE conviction is unconstitutional because it denied him equal protection and due process and is cruel and unusual punishment. He bases this claim on the fact that he had no prior felony drug convictions and had only one prior felony conviction (in 1982) for which he was sentenced to probation. This argument is foreclosed. A life sentence is not unconstitutionally disproportionate to a first time drug offense. Johnson, 54 F.3d at 1164.

IV.

William Wilson and Norman Wilson argue that they are entitled to a new trial on their firearms (§ 924(c)) convictions under count six because the jury instructions on what constitutes "use" of a firearm were erroneous in light of Bailey v. United States, 116 S. Ct. 501 (1995), which was decided after they were tried. In Bailey the Supreme Court narrowed the meaning of the term "uses" in § 924(c). The Court ruled that proving "use" requires "evidence to show an active employment of the firearm by the defendant." Id. at 505 (emphasis in original). "The active-employment understanding of `use' certainly includes brandishing, displaying, bartering, striking with, and most obviously, firing or attempting to fire, a firearm." Id. at 508. "`[U]se' must connote more than mere possession." Id. at 506.

19

Thus, a person does not "use" a gun merely by concealing it "nearby to be at the ready for an imminent confrontation." Id. at 508.

The district court here instructed the jury that"`uses' means the knowing possession of the firearm for security regardless of whether the weapon is ever referred to, displayed, pointed or fired." J.A. 582. The court further instructed that "use" could be proved by a gun's "presence and availability in light of an evident need" or simply by its "availab[ility] to assist or aid in the commission of a drug trafficking crime." Id.

It is quite apparent that the district court's "use" instruction, while correct under Fourth Circuit precedent at the time, was plainly erroneous in light of Bailey. However, even if we assume that the error affected William Wilson and Norman Wilson's substantial rights, see Johnson v. United States, 117 S. Ct. 1544, 1550 (1997), we would exercise our discretion to correct the error only if"failure to do so would result in a miscarriage of justice, such as when . . . the error `seriously affect[s] the fairness, integrity or public reputation of judicial proceedings,'" United States v. Hastings , No. 94-5670, slip op. at 15 (4th Cir. Jan. 14, 1998) (quoting United States v. David, 83 F.3d 638, 647 (4th Cir. 1996)). Here, the erroneous use instruction did not result in a miscarriage of justice because, as we demonstrate below, the jury, in convicting the Wilsons on count six, necessarily found gun use in the post-Bailey sense.

We begin by looking at what count six charged. It charged six members of the Court Boys drug ring of "us[ing] and carry[ing] a firearm during and in relation to a drug trafficking crime" on a single day, August 18, 1993. J.A. 60. Although neither William Wilson nor Norman Wilson actually used or carried a gun during the event giving rise to this charge, the government contends that William Wilson is guilty as an aider and abettor and Norman Wilson is guilty through conspirator liability.

The government's firearms evidence on count six is limited to a single event that lasted about one-half hour on the night of August 18, 1993, the date mentioned in that count.

An item of background information is necessary for an understanding of the gun incident on August 18. Members of the Court Boys

20

drug ring had been using the apartment of Erica Hall, located at 95 Grove View Terrace, as a safe haven during police sweeps of the projects. Ms. Hall, however, decided that she no longer wanted her apartment to be used as a hideout, and her live-in boyfriend, David Williams, informed the gang of her wishes. Ms. Hall did extend visiting privileges to William Wilson, but she told him not to "let [the others] back in [her] house." J.A. 213.

We return to the night of August 18, 1993, when several members of the ring (mainly street dealers), who were carrying on their drug business in Grove View Terrace, got word of a police sweep. The group went immediately to Ms. Hall's apartment, ignoring her earlier admonition. They were met at the door by William Wilson, who had been at Ms. Hall's apartment taking a nap. Although Wilson knew of Ms. Hall's wishes, he let the group (seven persons) enter. Three of the entering group were carrying firearms, including a rifle and two handguns. When they arrived, David Williams, Ms. Hall's boyfriend, was in an upstairs bedroom. Several in the gang went immediately upstairs and began to beat Williams, using the guns, a broomstick, and an electric fan. After the beating had gone on for five or ten minutes, one armed member of the gang forced another member at gunpoint to participate in the assault. The severe beating of Williams was in retaliation for his and Hall's efforts to end the use of the apartment as a safe haven. Although William Wilson was present during the beating, he did not strike Williams. During a lull, however, William Wilson told Williams, "I should f--- you up too for messing with my stash." J.A. 458. The beating lasted about one-half hour, and the men then left the apartment. There was no evidence that any guns were being stored in the apartment on August 18.

Based on this evidence, we are satisfied that the guilty verdict on count six was not attributable to the erroneous"use" instruction. Again, the incident lasted for only one-half hour. The only evidence about use was active use involving pistol whipping and brandishment. This is use in the post-Bailey sense of the word. Moreover, there is no evidence of storage, mere possession, or any inactive "use" that would have qualified as use before Bailey. In sum, we are convinced that the jury made a finding of use as it is understood post-Bailey.

William Wilson argues that the evidence did not establish that he aided and abetted a § 924(c) violation on August 18, 1993. "To be

21

convicted of aiding and abetting, participation in every stage of an illegal venture is not required, only `participation at some stage accompanied by knowledge of the result and intent to bring about that result.'" United States v. Arrington, 719 F.2d 701, 705 (4th Cir. 1983) (quoting United States v. Hathaway, 534 F.2d 386, 399 (1976)). As we just demonstrated, there is evidence that William Wilson's associates used firearms in the post-Bailey sense. We also believe there is evidence to support his firearms conviction based on aiding and abetting. William Wilson knew of the pistol whipping of David Williams because he (Wilson) saw it happen. He made it possible by admitting the perpetrators into Ms. Hall's apartment despite her specific instruction that he "not let them back in[her] house." J.A. 213. During a lull in the beating William Wilson told the victim that he, too, should have participated in the assault. Wilson then stood by and watched as the pistol whipping resumed. It can be reasonably inferred from all of this that William Wilson had the requisite intent to "bring about" the pistol whipping of David Williams. There is sufficient evidence to support William Wilson's conviction as an aider and abettor under § 924(c).

Norman Wilson argues that there is insufficient evidence to convict him of the § 924(c) violation (count six) on the basis of Pinkerton liability. See Pinkerton v. United States, 328 U.S. 640, 646-47 (1946) (holding fellow conspirators liable for substantive offenses committed by a co-conspirator in furtherance of the conspiracy). A defendant may be convicted of a § 924(c) charge on the basis of a co-conspirator's use of a gun if the use was in furtherance of the conspiracy and was reasonably foreseeable to the defendant. United States v. Chorman, 910 F.2d 102, 110-11 (4th Cir. 1990). Several of Norman Wilson's co-conspirators used firearms to club David Williams. The evidence supports a finding that this gun use was in furtherance of the drug conspiracy. Erica Hall's apartment had been a vital safe house for the Court Boys conspiracy for some time. The aims of the conspiracy were furthered by the co-conspirators' use of guns against someone (Williams) who had tried to deprive the conspirators of a needed hideout. And, as the prosecutor argued to the jury, it is reasonable to infer that such an active employment of guns would be foreseeable to the absent co-conspirator, Norman Wilson. Indeed, Norman Wilson got involved in the matter at a later date when he threatened one of David Williams's attackers whom Wilson believed had snitched to

22

the police about the beating. Accordingly, there was sufficient evidence to find Norman Wilson guilty of a § 924(c) violation under Pinkerton.

V.

Norman Wilson and William Wilson also argue that the district court erred in admitting four photographs offered by the government to illustrate the results of the gun use charged to them in count six. The photographs were of David Williams, the man who was pistol whipped by certain members of the drug ring on August 18, 1993. The photographs, taken right after the beating, show cuts, bruises, and swelling on Williams's face, arms, and back. The Wilsons argue that the photographs were of marginal relevance and should have been excluded because their "probative value [was] substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403.

The photographs were probative on count six's § 924(c) charge because they revealed the extent to which Williams was pistol whipped by several Court Boys. The trial judge balanced the probative value of the photographs against their potential for unfair prejudice, and his decision to admit them must stand unless there was an abuse of discretion. See United States v. Bailey , 112 F.3d 758, 770 (4th Cir.), cert. denied, 118 S. Ct. 240 (1997). We believe that admitting the photographs was not an abuse of discretion.

VI.

William Wilson argues that there is insufficient evidence to support his conviction on count one, which charged that he was part of a conspiracy to possess crack cocaine with the intent to distribute it. William Wilson contends that if he sold drugs at all,"he did so infrequently and . . . independently of the [Court Boys] drug organization." Appellants' Br. at 42. This argument fails.

Recently, in United States v. Burgos, 94 F.3d 849 (4th Cir. 1996), cert. denied, 117 S. Ct. 1087 (1997), we outlined the standards for reviewing a drug conspiracy conviction, beginning with the basics:

23

> To prove conspiracy to possess cocaine with intent to distribute, the Government must establish that: (1) an agreement to possess cocaine with intent to distribute existed between two or more persons; (2) the defendant knew of the conspiracy; and (3) the defendant knowingly and voluntarily became a part of this conspiracy.

Id. at 857. We noted that because there is often "little direct evidence of . . . an agreement . . ., a conspiracy generally is proved by circumstantial evidence and the context in which the circumstantial evidence is adduced." Id. Finally, we reiterated, "[o]nce it has been shown that a conspiracy exists, the evidence need only establish a slight connection between the defendant and the conspiracy to support conviction." Id. at 861 (internal quotation marks and citations omitted).

Here, Ronald Perkins, one of the two ringleaders of the conspiracy, testified that Norman Wilson, the other ringleader, would sometimes give drugs to his brother, William Wilson, to sell. Perkins also testified that he and Norman Wilson gave William Wilson a Jeep. Steve Evans testified that he had seen William out on the street dealing crack. Kelly Debnam testified that on a few occasions he sold William Wilson a few $25 rocks (of crack cocaine) for William to resell. Michael Whitlock testified that in Grove View Terrace, he was "selling with or working with," among others, William Wilson. J.A. 410. Finally, William Wilson admitted several of the conspiracy's street dealers into Erica Hall's apartment and stood by while they savagely pistol-whipped David Williams. This evidence is sufficient to establish that William Wilson was a knowing and voluntary participant in the drug conspiracy, even though he might have operated at the perimeter.

VII.

Norman Wilson and William Wilson argue that the trial judge's extensive questioning of government witnesses gave the appearance of partiality. They do not complain about specific questions. Rather, they simply contend that the judge asked far too many questions. According to the Wilsons, the judge assumed the role of prosecutor and gave the impression that the prosecution witnesses were credible.

24

The defendants objected at trial, so we review the trial judge's interrogation for abuse of discretion. United States v. Castner, 50 F.3d 1267, 1272 (4th Cir. 1995). "The court may interrogate witnesses, whether called by itself or by a party." Fed. R. Evid. 614(b). A judge "should not hesitate to ask questions for the purpose of developing the facts." United States v. Parodi, 703 F.2d 768, 775 (4th Cir. 1983). However, a judge must not "give . . . the appearance of bias or partiality in any way or become . . . so pervasive in his interruptions and interrogations that he may appear to usurp the role of either the prosecutor or the defendant's counsel." Id. at 776. Here, the district judge did question witnesses extensively, but the questions mainly elicited background information about the drug business. In any event, the judge instructed the jury not to draw any improper inferences from his questioning. Considering everything, we cannot say that the trial judge abused his discretion.

VIII.

Finally, Norman Wilson and William Wilson argue that if William Talley's convictions are vacated because the prosecutor branded him a murderer, their convictions should also be vacated. Specifically, the Wilsons say their convictions should be set aside because the jury was given a Pinkerton instruction and because"it is impossible to gauge the damage done" to them by the prosecutor's improper argument. Appellants' Br. at 37. We disagree. The prosecutor did not accuse the Wilsons of being involved in the murder assigned to Talley, nor did the prosecutor claim that the murder was a foreseeable act in furtherance of the conspiracy. The Wilsons are not entitled to a new trial.

IX.

William Talley's convictions are vacated, and his case is remanded for a new trial. Norman Wilson's conviction on the conspiracy count is remanded to the district court with instructions to vacate his conviction (and its accompanying sentence) on that one count. Norman Wilson's remaining convictions and William Wilson's convictions are affirmed.

AFFIRMED IN PART, VACATED AND REMANDED IN PART, AND VACATED AND REMANDED IN PART WITH INSTRUCTIONS

25