**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.                                                                                    No. 96-4761

PHILIP MANGLITZ,
<u>Defendant-Appellant.</u>

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.                                                                                    No. 96-4762

PHILIP MANGLITZ,
<u>Defendant-Appellant.</u>

Appeals from the United States District Court
for the District of Maryland, at Baltimore.
Herbert N. Maletz, Senior Judge, sitting by designation.
(CR-95-314-S)

Argued: January 30, 1998

Decided: April 28, 1998

Before WILLIAMS and MICHAEL, Circuit Judges, and KISER,
Senior United States District Judge for the
Western District of Virginia, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Clarke Francis Ahlers, Columbia, Maryland, for Appellant. Richard Charles Kay, Assistant United States Attorney, Baltimore, Maryland, for Appellee. **ON BRIEF:** Lynne A. Battaglia, United States Attorney, Baltimore, Maryland, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Philip Manglitz was convicted in district court on several charges relating to money laundering and drug (marijuana) trafficking. He appeals his conviction, arguing mainly that the prosecutor engaged in improper conduct that deprived him of a fair trial. He also argues that the district court erred in using the drug conspiracy guideline instead of the money laundering guideline in setting the sentence for his drug conspiracy conviction. For the reasons that follow, we affirm his conviction and sentence.

I.

Randolph Ayersman and Dana Kleberg were part of a marijuana importation and distribution ring. The marijuana was harvested in Mexico, imported into California, and then transported to Ayersman in Maryland. Ayersman would consign the marijuana to Kleberg, who would supply it to other dealers. Part of the proceeds from the marijuana sales journeyed back through the same conduit, mainly in bundles of $5,000 placed in brown paper bags. This operation generated large cash profits for Kleberg and Ayersman, which they sought to launder.

The defendant in this case, Philip Manglitz, volunteered his services and that of his real estate company, Carman Associates, to laun-

der cash for the two marijuana traffickers. Manglitz would sell plots of land in Howard County, Maryland, to Ayersman and Kleberg in exchange for cash payments from the profits of the drug trafficking operation. Manglitz would then misrepresent the sale price of the land on the sales contracts at far below the amount Ayersman and Kleberg paid. This way, Ayersman and Kleberg would turn their drug trafficking profits into "legitimate" real estate investments, and Manglitz and his partner, Ronald Carter, would pocket the excess cash. Since Manglitz handled the money in these transactions, Carter did not know the source of the money.

Ayersman was arrested by federal agents, and he and Kleberg began to cooperate with the government. Kleberg taped several conversations with Manglitz, in which Manglitz made several incriminating statements. The testimony of Ayersman, Kleberg and other cooperating witnesses placed Manglitz at the heart of the money laundering scheme, with Manglitz receiving $5,000 bundles of cash in brown paper bags from Ayersman and Kleberg.

On July 27, 1995, Manglitz was indicted for conspiracy to distribute marijuana and money laundering. Prior to trial Judge Smalkin granted a motion in limine under Fed. R. Evid. 404(b) precluding the government from introducing certain evidence of prior criminal acts by Manglitz. This evidence included Manglitz's 1972 drug importation conviction and the specifics of his history in the marijuana trade in the 1970s and early 1980s. Thereafter, the case was assigned to Judge Maletz for trial. Judge Maletz confirmed the prior evidentiary rulings and further ruled that evidence suggesting that Manglitz threatened witnesses with physical violence was inadmissible under Fed. R. Evid. 403.

On June 20, 1996, the jury convicted Manglitz of conspiracy to distribute marijuana, 21 U.S.C. § 846, conspiracy to launder money, 18 U.S.C. § 1956(h), money laundering, 18 U.S.C.§ 1957(a), and aiding and abetting, 18 U.S.C. § 2. At sentencing Manglitz argued that the applicable guideline was § 2S1.1, which concerns money laundering, instead of § 2D1.1, which concerns drug distribution. The court disagreed and sentenced him to 108 months of imprisonment. Manglitz now appeals.

II.

A defendant must satisfy a two-part test to bring about the reversal of his conviction for prosecutorial misconduct. Specifically, the defendant must show that the prosecutor's conduct was (1) improper and (2) "prejudicially affected the defendant's substantial rights so as to deprive [him] of a fair trial." United States v. Wilson, 135 F.3d 291, 297 (4th Cir. 1998) (citations and internal quotations omitted); United States v. Harrison, 716 F.2d 1050, 1053 (4th Cir. 1983).

Manglitz claims that there were several instances where the prosecutor engaged in misconduct requiring reversal. He first argues that the prosecutor acted improperly by withholding exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963), and the Jencks Act, 18 U.S.C. § 3500. He further contends that the prosecutor deliberately flouted the trial court's evidentiary rulings and elicited inadmissible testimony from witnesses during the trial. Finally, Manglitz alleges that the prosecutor's closing argument discussed excluded evidence and impermissibly commented on his silence during trial. We examine each of these arguments in light of the legal standard for prosecutorial misconduct.

A.

Manglitz first argues that the prosecution failed to provide him written records concerning his partner, Carter. These records contained notes from Carter's initial statements to federal investigators, in which Carter suggested that Manglitz received the large amounts of cash in question from the sale of farm equipment rather than money laundering. This evidence was not turned over to Manglitz until the judge discovered it by chance while reviewing government reports of witness interviews for a different purpose during trial. Manglitz argues that by not handing these notes over to him, the prosecutor acted improperly in violation of Brady v. Maryland, 373 U.S. 83 (1963), which requires the government to disclose to the defense any exculpatory information.

There is no question that this material was exculpatory or that the prosecution was obligated to turn it over. This does not automatically mean that Manglitz's rights under Brady were violated, however.

4

Belated disclosure of Brady material is a constitutional violation only if the defendant was unable to make effective use of the exculpatory material initially kept from him. See United States v. Smith Grading & Paving, Inc., 760 F.2d 527, 532 n.6 (4th Cir. 1985). Here, the information was disclosed to Manglitz before Carter testified. Manglitz therefore had a full opportunity to prepare for and execute an effective cross examination based on that material. Indeed, the only prejudice Manglitz can claim is that he would have cited the allegedly exculpatory evidence in his opening statement. However, because Manglitz was able to make effective use of the material in cross-examination, he was not unduly prejudiced by his inability to cite it in his opening statement. Since there was no Brady violation in the end, there was no prosecutorial misconduct that warrants reversal.

Similarly, Manglitz alleges that the prosecutor failed to disclose handwritten notes made by federal agents when they interviewed Ayersman. The trial judge found that this material should have been disclosed under the Jencks Act, 18 U.S.C. § 3500. The Act requires that statements made by a government witness must be turned over to the defense after the direct examination of that witness at trial. Just prior to Ayersman's testimony, the judge ordered the production of the agents' handwritten notes of Ayersman's statements to them. Although the government objected, arguing that a typed copy of the notes had already been produced, the judge did not rescind the order for production.

As with the Brady material, these notes were turned over to Manglitz in time for him to review them before cross-examining Ayersman. This is in literal compliance with the Jencks Act's requirement that such material be provided after the direct testimony of the witness. Furthermore, the handwritten notes were duplicative of the typed statements previously received by the defense. Because the legal requirements of the Act were complied with, and because Manglitz was able to use the material at the appropriate time, there was no conduct by the prosecutor that requires reversal.

B.

Manglitz also points to the prosecutor's tactics in his examination of certain witnesses as further evidence of misconduct. Specifically,

5

Manglitz argues that the prosecutor deliberately framed his questions to elicit evidence that had been excluded by the court's order. The first instance concerns evidence that Manglitz had been active in the drug trade in the late 1970s and early 1980s and that he had been convicted for importing marijuana in 1972. Before the trial began, Judge Smalkin had excluded this evidence, saying that these prior bad acts were too remote in time to be probative in Manglitz's impending trial. During the trial, the prosecutor elicited the following testimony from Kleberg:

> Q Did [Manglitz] say thing about the marijuana business?
>
> A Yes.
>
> Q What did he say about it?
>
> A That he had been in the business at one time.
>
> Q What else did he tell you about the marijuana business?
>
> A Well, he had been arrested down on the Texas-Mexican --

Judge Maletz halted the testimony immediately. After consulting with counsel, the judge issued the following curative instruction:

> THE COURT: Now the jury may remember the testimony of this witness about a conversation he had with Mr. Manglitz aboard a plane on route from Acapulco back to the United States. At one point, you may recall, Mr. Kay made the following inquiry: And what else did he say? I sustained an objection.
>
> Now do members of the jury recall what this witness's answer was before I sustained the objection? Well, that answer was totally inappropriate. It will be totally disregarded. The witness should not have answered in view of the fact an objection was pending.

6

> I will repeat, the question was improper, the answer was not only improper it was prejudicial and shall be disregarded in toto as though you had never heard it.

The prosecutor knew that the evidence about Manglitz's history had been specifically excluded by the judge. He also should have known that by pressing this line of inquiry he ran a considerable risk of violating Judge Smalkin's earlier ruling. We therefore agree with Manglitz that the prosecutor went too far in questioning Kleberg. However, we disagree with Manglitz that the testimony elicited in the improper questioning was so prejudicial as to mandate a reversal.

One of the factors which we must consider in evaluating prejudice is whether the trial court issued a curative instruction. A curative instruction can prevent an otherwise prejudicial comment from misleading the jury. See United States v. Loayza , 107 F.3d 257, 262 (4th Cir. 1997). Here, the judge gave a very strong instruction admonishing the jurors to disregard the testimony. The judge moved quickly and decisively, and we think his action was sufficient to preserve the integrity of the trial in the face of the prosecutor's improper questioning. Accordingly, we find no prejudice here.

Similarly, Manglitz argues that the prosecutor acted improperly by eliciting other testimony about Manglitz's past as a drug trafficker. Judge Maletz had ruled before trial that the government could produce testimony from James Lee about his money laundering scheme with Manglitz in the 1970s. Specifically, Lee could testify that Manglitz had sold land to him in exchange for cash from drug proceeds. The court further ruled that any testimony by Lee about Manglitz's direct involvement in marijuana trafficking (as opposed to money laundering) would be excluded. When he examined Lee at the trial, the prosecutor first asked him if he had ever purchased property from Manglitz. Lee described how he had purchased land from Manglitz using $50,000 in cash from drug proceeds. The prosecutor then asked why Lee had given the drug money to Manglitz. Lee responded: "It was because of my partner was doing a drug deal in Miami." Again, the trial judge immediately stopped this line of questioning. Manglitz argues that this question and answer violated the judge's pretrial ruling against presenting evidence about Manglitz's drug trafficking activities.

7

We disagree. The jury only heard that Lee had an unidentified partner doing a drug deal in Miami. This was consistent with the trial judge's ruling that Lee, in testifying about laundering money through Manglitz, could say that he (Lee) used drug proceeds to buy land from Manglitz. Lee's isolated answer that referred to his unnamed drug partner, without more, could not be read to suggest that Manglitz had been a drug trafficker in the past. We do not see how the prosecutor's question, which led to the one sentence answer by Lee, amounted to improper conduct by the prosecutor.

Finally, Manglitz contends that the prosecutor tried to introduce excluded evidence that Kleberg feared physical harm from Manglitz. Before trial, Judge Maletz considered a motion from Manglitz to exclude a letter by Kleberg memorializing a conversation he had with Ayersman. The letter indicates that Ayersman warned Kleberg to fear Manglitz and intimated that Manglitz had murdered his own brother.[1] The judge ruled that this evidence was inadmissible as unduly prejudicial under Fed. R. Evid. 403.

In Manglitz's cross-examination of Kleberg at trial, Kleberg was asked when he first mentioned Manglitz's name to federal investigators. The following exchange ensued:

> Q Well, the area of questioning by [DEA agent] Forletta at the first meeting with you where the name Mr. Manglitz came up was an area of questioning involving your assets, is that correct?
>
> A No, it wasn't.
>
> Q What was the topic?
>
> A My personal safety?
>
> Q Oh, your safety?
>
> A Yes.

---

[1] This allegation is otherwise unsubstantiated in the record.

8

Q You were scared for your safety?

A Yes.

Q You are the guy with all the guns, right?

A I was afraid for my personal safety.

. . .

Q And so you said to the DEA I am scared of certain people, is that correct?

A That is correct.

Q I see. So naturally the DEA took interest in the people you were scared of, is that correct?

A That is correct.

As a result of this testimony, the judge instructed the prosecutor to tell Kleberg "to make no reference whatsoever to any violence or threat by Mr. Manglitz" during redirect. During his questioning of Kleberg on redirect, the prosecutor asked him: "You testified on cross-examination that you were concerned about personal safety, do you recall that?" The judge halted the proceedings and criticized the prosecutor at the bench for asking the question. The judge then instructed the jury to draw no inference from the question. Manglitz urges that this question constituted prosecutorial misconduct.

The judge's pretrial ruling was clear that no reference was to be made at trial to the Kleberg letter documenting the conversation between Ayersman and Kleberg. Manglitz, however, cross-examined Kleberg on a different topic: the circumstances under which Manglitz's name came up in a meeting between Kleberg and federal agents. The judge's pretrial ruling did not cover the meeting between Kleberg and federal agents, and Manglitz opened the door by cross-examining Kleberg about this meeting. The judge nevertheless admonished the prosecutor just before Kleberg's redirect examination

to make sure that Kleberg did not refer to "any violence or threat" made by Manglitz. This admonition did not appear to bar the prosecutor from asking Kleberg on redirect about his cross-examination testimony concerning his meeting with federal agents. Kleberg had testified under cross-examination that he first mentioned Manglitz's name to the agents in connection with Kleberg's concern for his own personal safety. On redirect, the prosecutor referred to Kleberg's testimony about the meeting with federal agents by asking if he remembered testifying that he had been concerned about personal safety during the meeting. When the judge stopped the prosecutor, the prosecutor said he expected Kleberg to reply to this question by simply stating what he had already indicated on cross-examination, that he was afraid of Manglitz. The prosecutor also told the judge that Kleberg's testimony would not have referred to "violence or threats" by Manglitz. We need not decide whether the prosecutor violated the judge's admonition.

Even if the prosecutor's question was improper, Manglitz can show no prejudice from it. Among the factors we must consider in evaluating prejudice from prosecutorial impropriety is the degree to which the conduct would mislead the jury and whether there was a curative instruction by the court. See Loayza, 107 F.3d at 262-63. Here, the prosecutor's question was prompted by Manglitz's cross-examination of Kleberg. Moreover, all that the jury heard was the prosecutor asking a question that restated Kleberg's earlier testimony as elicited by Manglitz. Furthermore, the judge issued a very strong curative instruction immediately after the question was asked. When we consider the question and the judge's prompt curative instruction together, we do not see any prejudice.[2]

C.

Manglitz also charges that the prosecutor made improper remarks to the jury in his closing. Specifically, he argues that the prosecutor improperly accused him of bribing witnesses and impermissibly com-

_____

[2] Manglitz also asserts that a question to Carter by the prosecutor implied that Manglitz had committed bank fraud. Because the judge struck the testimony and directed the prosecutor to make no use of it during his closing argument, we find no prejudice.

mented on the fact that Manglitz exercised his right not to testify. We disagree.[3]

1.

In a closing argument, a prosecutor may argue that the evidence gives rise to an inference, so long as that inference can be reasonably drawn. See Wilson, 135 F.3d at 298. He may not press the inference so far that the facts do not support it, however. See id.

Manglitz contends that the prosecutor misrepresented the evidence by arguing that Manglitz offered a bribe to Kleberg in exchange for his silence. These statements were based on a taped conversation between Manglitz and Kleberg made before Manglitz's arrest. Manglitz stated on tape that "if you guys come through stand up guys, right, and you don't roll over, I'm gonna bend over backwards to help you do whatever you wanna do." Manglitz offered to send Kleberg money in the unlikely event that Kleberg went to jail. He then discussed how valuable it was to a prisoner to receive money from people outside the prison:

> You can buy sneakers while you're in there when your sneakers wear out. All sorts of things, so- sh--, this guy up in Hagerstown was even telling me he can buy a t.v.. I sent him a thousand bucks. . . .

> Years ago when, when he went down for, for a couple keys of coke, and ah, I sent him money for a t.v.. He was top dog in there you know. If you got money to draw, most of the guys that go in there have gotten wiped out of everything. They don't got a pot to p--- in . . . .

Id. Subsequent testimony revealed that Lee, Manglitz's partner in laundering drug money in the 1980s, was the prisoner in Hagerstown

_____

[3] Manglitz also argues that the prosecutor misrepresented the testimony of Cooper, Forest, Lee and Kleberg. Because we do not find anything improper in the prosecutor's characterization of that testimony, we reject Manglitz's claims.

to whom Manglitz sent the money, although Lee denied that he had any understanding with Manglitz.

From this evidence, the prosecutor argued that Manglitz was offering to pay Kleberg and Ayersman if they went to prison in exchange for their silence. This seems a reasonable inference from the evidence in the record. While Lee denied that he had an understanding with Manglitz, Manglitz told the story to Kleberg in such a way as to allow a reasonable inference that he had. In any event, the prosecutor was arguing that Manglitz had tried to bribe Kleberg. This was a fair argument, particularly in light of Manglitz's statement that he would "bend over backwards" if Kleberg would not "roll over." We conclude that the prosecutor did not act improperly in making this argument.

2.

Manglitz also contends that the prosecutor in his rebuttal argument impermissibly commented on Manglitz's refusal to testify. A statement by the prosecutor is improper if it is manifestly intended to be, or would naturally and necessarily be taken to be, a comment on the defendant's failure to testify. See United States v. Anderson, 481 F.2d 685, 701 (4th Cir. l973), aff'd sub nom. Anderson v. United States, 417 U.S. 211 (1974). The statement Manglitz complains of referred to an aborted transaction on February 28, 1995, in which Manglitz refused to accept a cash payment from Kleberg while being taped. In his closing argument, Manglitz invited the government to explain why Manglitz did not take the cash. In reply, the prosecutor noted that Manglitz first looked at the cash and appeared ready to accept it before having a sudden change of heart when he entered Jack Cooper's office to close the deal. "What happened when they got to Mr. Cooper's office? . . . Who knows? Only one person knows. Only one person in the world who knows and that is Philip Manglitz, he knows." The prosecutor went on to state the inference that Manglitz suspected that Carter was taping the conversation. At this point the judge court admonished the jury not to draw any conclusion from the fact that Manglitz did not take the stand.

We find that the statement about what was in Manglitz's mind during the aborted transaction was invited by the defense. When the defense does something to invite an allegedly improper comment by

12

the prosecutor, that weighs against the prejudicial nature of the comment. See United States v. Harrison, 716 F.2d 1050, 1053 (4th Cir. 1983). Here, the defense challenged the prosecutor to explain what caused Manglitz to decline the cash offered by Kleberg in that meeting. The prosecutor was merely drawing reasonable inferences from the evidence in order to answer the question. In so doing, he merely noted that only Manglitz knew what he was thinking at that time. This is similar to a case where a prosecutor argues that a witness's testimony was uncontradicted, even though the only other person who could contradict that testimony was the accused. We have repeatedly found that tactic to be proper. See United States v. Francis, 82 F.3d 77, 78 (4th Cir. 1996). Even if the prosecutor's statement here was improper, the judge issued a strong curative instruction which avoided any prejudice to Manglitz as a result of it. Cf. Loayza, 107 F.3d at 262.

The prosecutor continued his argument by agreeing with the judge's instruction and emphasizing that the government had the burden to prove its case beyond a reasonable doubt."And we have met that burden. I don't mean to suggest anything else to you about the defendant not taking the stand." After a defense objection, and the judge's suggestion that the prosecutor restate the sentence, the prosecutor modified his statement: "I don't want to suggest anything to you about Mr. Manglitz not taking the stand." Manglitz contends that the prosecutor's first follow-up statement was improper because of the word "else." He argues that by using this word the prosecutor implied that it was appropriate for the jury to take Manglitz's failure to testify into account in considering whether the government met its burden. While we agree that the word might have been better left unsaid, we are not convinced by Manglitz's argument that this one word demonstrates deliberate misconduct by the prosecutor. Rather, the circumstances indicate that it was a slip of the tongue. As a result, we do not think the prosecutor's first formulation (using"else") was manifestly intended to comment on Manglitz's silence. See Anderson, 481 F.2d at 701. Furthermore, the prosecutor had just emphasized the government's exacting burden of proof. We do not see how adding the word "else" could be taken to suggest that the burden was somehow lessened by Manglitz's silence. At any rate, the prosecutor corrected his statement immediately and made it abundantly clear that the jury could draw no conclusion from Manglitz not taking the stand. This,

13

combined with the court's instruction given a minute or so earlier, is enough to neutralize any possible prejudice to Manglitz.

Taken as a whole, therefore, we conclude that the prosecutor's closing argument did not meet the standard of impropriety and prejudice required to reverse a conviction on the grounds of prosecutorial misconduct.**4**

III.

Manglitz also argues that the district judge erred in applying the Sentencing Guidelines. He claims that because his conviction stems from the fact that he laundered money for a marijuana distribution ring, he should be sentenced under the money laundering guideline instead of the drug conspiracy guideline. We disagree.

Manglitz was convicted of violating 21 U.S.C. § 846, conspiracy to distribute marijuana. The Guidelines provide that the sentence for a conviction derives from the section "most applicable to the offense of conviction." § 1B1.2(a). Application Note 1 to this section points to the statutory index included in Appendix A for guidance. That index clearly indicates that the appropriate guideline for sentencing under 21 U.S.C. § 846 is § 2D1.1, "Unlawful Manufacturing, Importing, Exporting, or Trafficking (Including Possession with Intent to Commit These Offenses); Attempt or Conspiracy." We are bound to follow the commentary of the sentencing guidelines as authoritative. See Stinson v. United States, 508 U.S. 36 (1993). Since the guidelines clearly indicate that the conduct of Manglitz's conviction, conspiracy to distribute marijuana, is covered by § 2D1.1, the judge did not err in applying that guideline.

_____

**4** Manglitz presses the further argument that the prosecutor behaved improperly in the grand jury proceedings by misrepresenting the evidence. But a guilty verdict in a jury trial renders any error before a grand jury harmless. See United States v. Mechanik, 475 U.S. 66 (1986). Because we affirm Manglitz's conviction, we reject his grand jury claim.

Manglitz's conviction and sentence are

<u>AFFIRMED</u>.

15