**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

CHONG LAM,

*Defendant-Appellant,*

v.

BURBERRY LIMITED; LOUIS VUITTON
NORTH AMERICA, INCORPORATED;
VSE CORPORATION,

*Movants.*

No. 11-4056

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

SIU YUNG CHAN,

*Defendant-Appellant,*

v.

BURBERRY LIMITED; LOUIS VUITTON
NORTH AMERICA, INCORPORATED;
VSE CORPORATION,

*Movants.*

No. 11-4081

Appeals from the United States District Court
for the Eastern District of Virginia, at Richmond.
James R. Spencer, Chief District Judge.
(3:07-cr-00374-JRS-1; 3:07-cr-00374-JRS-2)

Argued: January 27, 2012

Decided: April 16, 2012

Before SHEDD, DUNCAN, and FLOYD, Circuit Judges.

Affirmed by published opinion. Judge Duncan wrote the opinion, in which Judge Shedd joined. Judge Floyd wrote a separate opinion concurring in part, dissenting in part, and dissenting from the judgment.

## COUNSEL

**ARGUED:** Andrea L. Moseley, John Kenneth Zwerling, ZWERLING, LEIBIG & MOSELEY, P.C., Alexandria, Virginia, for Appellants. John H. Zacharia, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Cary Citronberg, ZWERLING, LEIBIG & MOSELEY, P.C., Alexandria, Virginia, for Appellants. Lanny A. Breuer, Assistant Attorney General, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Neil H. MacBride, United States Attorney, Alexandria, Virginia, Brian R. Hood, Jessica Aber Brumberg, Assistant United States Attorneys, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee.

**OPINION**

DUNCAN, Circuit Judge:

A jury convicted appellants Chong Lam and Siu Yung Chan (collectively "Appellants") of conspiracy to traffic in counterfeit goods, trafficking in counterfeit goods, and smuggling goods into the United States. The counterfeiting convictions were based on the jury's determination that a mark displayed on goods Appellants imported into the United States was a counterfeit of a trademark registered to fashion designer Burberry Ltd. ("Burberry"), depicting its signature plaid pattern (the "Burberry Check mark"). On appeal, Appellants advance various challenges to their convictions for trafficking in counterfeit goods under 18 U.S.C. § 2320(a). They also assert that certain comments made by prosecutors at trial necessitate a retrial. Because we find these arguments lacking in merit, we affirm.

I.

A.

The convictions in this case arise out of Appellants' participation in the manufacture, import, and sale of handbags and wallets bearing counterfeit trademarks. Since 1999, Appellants have owned or otherwise controlled at least 10 companies incorporated in the United States that engaged in the importation of both legitimate and counterfeit handbags and wallets.[1] Lam also had authority over at least three companies

---

[1]Specifically, the parties stipulated that Lam was president and Chan was manager of Global Import, Inc. and Marco Leather Goods, Ltd.; that Lam was an officer of The Perfect Impressions, Inc.; that Chan was president and Lam was vice president of Marco USA, Inc. and C&L Development, LLC; that Lam was president and Chan was treasurer of LY USA, Inc.; that Lam was president and Chan was secretary of CP USA, Inc.; that Chan was president of Best Handbags, Inc.; and that Lam was president and Chan was manager of Golden Horse USA Corporation.

located in China and Hong Kong that engaged in the manufacture and export of such goods.[2] Appellants transferred significant amounts of money among these various enterprises. They also used the United States-based companies' names interchangeably when importing goods, seemingly for the purpose of evading detection by U.S. Customs and Border Protection ("CBP").

Between 2002 and 2005, CBP issued seizure notices to a number of the corporations controlled by Appellants, each time informing the individual company that certain goods it had imported into the United States were being seized because CBP had determined that the goods were labeled with what were likely counterfeit trademarks.[3] The marks CBP identified as counterfeit were copies of legitimate marks registered to various luxury handbag and wallet manufacturers, including Burberry. These seizures occurred at several ports throughout the United States, including Houston, Texas; Newark, New Jersey; Los Angeles, California; New York, New York; and Norfolk, Virginia. Appellants' decision to spread their importing activities among multiple ports also appeared to be a ploy to evade CBP.

The specific goods at issue here were seized in 2005 at the port of Norfolk, Virginia. CBP became aware in August 2005 that shipments imported to Global Import, Inc. ("Global

---

[2]The parties further stipulated that Lam was an officer of Hong Kong Chung NGEI Investment, Ltd. and Chinese Prosperous International Ltd.; that Lam was chairman and president of Chinese Prosperous Group; and that Lam was the general manager of Longhai Zhong Yi Luggage and Bags, Ltd. and Chinese Prosperous Development, Ltd.

[3]CBP's initial conclusion that the trademarks at issue here were counterfeit is not determinative with regard to Appellants' liability under 18 U.S.C. § 2320(a) or any other federal criminal statute implicated in this case. The district court accordingly instructed the jury that, regardless of CBP's opinion on the matter, the jury bore the ultimate responsibility for determining whether a mark used by Appellants met the definition of "counterfeit" included in § 2320(e)(1).

Import")—one of the companies controlled by Appellants—contained what appeared to be counterfeit handbags. It thereafter flagged all subsequent shipments imported to Global Import, opening and examining containers included in such shipments. This effort led to three seizures, occurring on September 19, October 3, and October 10, 2005. On each occasion, CBP opened containers destined for Global Import and found goods bearing what appeared to be marks registered to Burberry and other luxury designers[4] "secreted" within legitimate handbags and gym bags. J.A. 1204. Specifically, CBP found a layer of legitimate merchandise on the top and bottom of each container, followed by a cardboard divider, concealing the goods bearing allegedly counterfeit marks within the interior of the container. CBP seized goods displaying marks it determined were likely counterfeit. These goods form the basis for the charges brought against Appellants.

## B.

On March 26, 2009, a federal grand jury sitting in the Eastern District of Virginia issued a superseding indictment charging Appellants[5] with conspiracy to traffic in counterfeit goods in violation of 18 U.S.C. § 371, trafficking in counterfeit goods in violation of 18 U.S.C. § 2320(a), and smuggling goods into the United States in violation of 18 U.S.C. § 545.

Appellants' first trial, lasting from January 11-25, 2010, resulted in a hung jury. Appellants' contentions on appeal arise from their convictions in the second trial.

---

[4]CBP also seized goods displaying what it considered to be counterfeits of trademarks registered to Gucci. The jury acquitted Appellants of counterfeiting Gucci trademarks, however. We therefore discuss only the seized goods bearing the counterfeit Burberry Check mark.

[5]Eric Yuen, an employee of Appellants, was also charged in the indictment. The jury acquitted Yuen on all counts.

Prior to the second trial, Appellants filed a motion in limine seeking to have the district court declare the phrase "substantially indistinguishable," as used in 18 U.S.C. § 2320, unconstitutionally vague. Section 2320(a) criminalizes "intentionally traffic[king] or attempt[ing] to traffic in goods or services and knowingly us[ing] a counterfeit mark on or in connection with such goods or services, . . . the use of which is likely to cause confusion, to cause mistake, or to deceive." Section 2320(e)(1) uses the disputed term "substantially indistinguishable" in its definition of "counterfeit mark," which it defines as a "spurious mark" that, inter alia, "is identical with, or substantially indistinguishable from, a mark registered on the principal register in the United States Patent and Trademark Office and in use." Appellants argued that an average person could not understand the meaning of "substantially indistinguishable" in this context and that the vagueness of the term encouraged arbitrary enforcement of the anticounterfeiting statute. They requested that the district court either declare the statute unconstitutionally vague or narrowly construe the language. The district court denied the motion.

C.

Appellants' retrial began on June 2, 2010. As relevant here, the government presented evidence that Burberry had registered the Burberry Check mark—a mark depicting Burberry's signature plaid pattern, created by intersecting red, white, black, and grey lines against a tan background—with the United States Patent and Trademark Office ("USPTO") in 1996. It demonstrated that Burberry also has a registered trademark for an equestrian knight symbol (the "Burberry Equestrian mark"). The government introduced into evidence examples of authentic Burberry handbags displaying the Burberry Check mark and authentic handbags displaying the combination of the Burberry Check mark and the Burberry Equestrian mark.

In addition, government witnesses testified that, in 2005, Burberry instituted a civil suit against Marco Leather Goods,

Ltd. ("Marco Leather Goods"), another company controlled by Appellants, because the company had registered for copyright protection an image that appeared to be the Burberry Check mark with an equestrian knight similar to the Burberry Equestrian mark superimposed over it. Appellants refer to this pattern as the "Marco mark," even though it was never registered as a trademark. This suit ended in a consent judgment requiring Marco Leather Goods to transfer the copyright to Burberry and to abandon an application it had filed with the USPTO seeking to register the same image.

Finally, the government produced testimony describing the seizures of goods imported by Appellants detailed above. A CBP agent explained the manner in which the wallets and handbags displaying allegedly counterfeit marks were packaged and transported. The government also introduced a number of samples of the goods seized from Norfolk that bore the allegedly counterfeit Burberry Check mark. Significantly, these wallets and handbags displayed Appellants' so-called Marco mark—the above-described pattern, which consisted of a plaid pattern similar to the Burberry Check mark with an equestrian knight superimposed over it.[6] At the close of the government's evidence, Appellants filed a motion for acquittal pursuant to Federal Rule of Criminal Procedure 29, which the district court denied.

In their case in chief, Appellants introduced expert testimony describing the combination of the plaid pattern and the knight overlay displayed on the goods seized at Norfolk as a "composite mark that consists of a number of components." J.A. 1381. Appellants' expert opined that a mark combining the Burberry Check mark and the Burberry Equestrian mark could qualify for trademark protection independently from both of the individual marks.

---

[6]The jury did not find the knight displayed on these goods to be a counterfeit of the Burberry Equestrian mark. Trial testimony indicates that it differed from the Burberry Equestrian mark in several respects.

At several points during the trial, the government suggested that whether an allegedly counterfeit mark was substantially indistinguishable from a legitimate mark should be analyzed from the viewpoint of a hypothetical "reasonable consumer of ordinary intelligence." J.A. 1368. The government made such statements at least twice during its cross-examination of Appellants' witnesses. During closing argument, the government also asserted several times that the jury should look to "the perspective of the average person" in comparing the goods. J.A. 1558. The district court sustained Appellants' objections to these comments as incorrect statements of the law.

In response to Appellants' objections and directly following the government's closing argument, the district court instructed the jury as follows:

> Obviously, you are to be guided by the instructions on the law that the court will provide to you. A lot of the lawyers have made references to what the law is or what they think it might be. But these instructions, I hope, will clear up, if there was some confusion. . . . Listen to me when it comes to what the law is.

J.A. 1559-60. At the beginning of formal jury instructions, the district court further informed the jury that "it is your sworn duty to follow the law as I am now in the process of defining for you. You must follow all of my instructions as a whole." J.A. 1560-61.

With regard to whether the mark on Appellants' goods was a counterfeit of the Burberry Check mark, the district court instructed the jury:

> [Y]ou have to determine whether or not the mark that is alleged to be counterfeit is identical to or substantially indistinguishable from the mark that is reg-

istered on the same goods in the Principal Register of the [USPTO]. . . . [I]n order to carry out your responsibility as it relates to that part of these instructions, you have to compare the marks, the mark on the alleged to be counterfeit and the mark that is the genuine mark.

Now, you do that, and you make a decision. This is based on your side-by-side comparison, use of your own eyes, and any other evidence that came into the record that might help you in that task. But it is for you to decide. If you decide that the mark is not identical or substantially indistinguishable, that pretty much ends the inquiry. That means it is not counterfeit.

J.A. 1587.

During deliberations, the jury submitted a question to the district court, asking if "when comparing the Marco plaid on the purses seized in Norfolk to the [Burberry Check mark], should we consider the presence of the Marco knight?" J.A. 1603. The district court responded:

You have heard evidence and argument that you can accept certain facts. On the one hand, the defendants presented evidence and argued that you accept as a fact that the plaid plus the Marco knight is a composite mark that should be compared as a composite mark with the [Burberry Check mark]. On the other hand, the government has put on evidence and argued that the plaid pattern alone on the alleged counterfeit bag is violative, meaning substantially indistinguishable, from the [Burberry Check mark]. Depending on the way you find facts, you may consider the Marco knight in comparing the marks. That's not the province of the court, it's the province of the jury. Of course, the defendants also contend

that the plaid by itself is not substantially indistin-
guishable and therefore not counterfeit.

J.A. 1603-04. Appellants did not object to this response.

On June 10, 2010, the jury found Appellants guilty of con-
spiracy to traffic in counterfeit goods, trafficking in counter-
feit goods, and smuggling goods into the United States. The
counterfeiting-related convictions were based, in part, on its
determination that the plaid displayed on the goods seized
from Appellants at Norfolk was a counterfeit of the Burberry
Check mark.

D.

Appellants renewed their motion for acquittal, pursuant to
Rule 29(c), and moved for a new trial, pursuant to Federal
Rule of Criminal Procedure 33, on August 11, 2010. They
argued that the evidence presented at trial was insufficient as
a matter of law to sustain a guilty verdict under § 2320 and
that a new trial was required because the government's alleg-
edly erroneous statements of law with respect to the perspec-
tive from which the jury was to determine whether a mark
was counterfeit prejudicially affected their rights such that
they were deprived of a fair trial.

The district court denied both motions. In a memorandum
opinion entered December 14, 2010, it first held that the evi-
dence presented at trial was sufficient to allow the jury to find
that the mark used on Appellants' goods was substantially
indistinguishable from the Burberry Check mark—a question
"exclusively within the purview of the jury." J.A. 2861.

The district court next considered Appellants' argument
that remarks made by the government necessitated a new trial.
It held that the government's comments were improper
because, in its estimation, they incorrectly stated the perspec-
tive from which the jurors were to consider whether a mark

was counterfeit. It next considered the six factors our circuit takes into account when determining whether a prosecutor's comments were so prejudicial that they deprived a defendant of a fair trial: (1) whether the government's remarks mislead the jury, (2) whether they were extensive, (3) the strength of the evidence supporting conviction absent the comments, (4) whether the government deliberately made the comments to mislead the jury, (5) whether the defendant invited the comments, and (6) the presence of a curative instruction. *See United States v. Lighty*, 616 F.3d 321, 361 (4th Cir. 2010). After thoroughly reviewing the trial transcript, the district court found that, although the government's comments were misleading and extensive, and Appellants did not invite the comments, the government did not make the comments with the purpose of deliberately misleading the jury. It also found that the government presented enough evidence to support Appellants' convictions in the absence of the misleading remarks. Finally, the district court considered its curative instructions, finding that they removed any prejudice the government's comments created. The district court based its denial of Appellants' Rule 33 motion on this final determination. Appellants timely appealed.

## II.

On appeal, Appellants advance four main arguments, all stemming from their convictions for "intentionally traffic[king] or attempt[ing] to traffic in goods or services and knowingly us[ing] a counterfeit mark on or in connection with such goods or services, . . . the use of which is likely to cause confusion, to cause mistake, or to deceive." 18 U.S.C. § 2320(a). As mentioned above, § 2320 goes on to define "counterfeit mark" as, as relevant here, "a spurious mark . . . that is identical with, or substantially indistinguishable from, a [registered] mark . . . the use of which is likely to cause confusion, to cause mistake, or to deceive." 18 U.S.C. § 2320(e)(1)(A). To obtain a conviction under § 2320(a), the government was required to prove that Appellants "'(1) trafficked or attempted

to traffic in goods or services; (2) did so intentionally; (3) used a counterfeit mark on or in connection with such goods and services; and (4) knew the mark was counterfeit.'" *United States v. Habegger*, 370 F.3d 441, 444 (4th Cir. 2004) (quoting *United States v. Giles*, 213 F.3d 1247, 1249 (10th Cir. 2000)).

Appellants first challenge the district court's denial of their motion for judgment of acquittal, arguing that the evidence presented at trial was insufficient to support their convictions. Second, they contend that the district court's response to the jury's question regarding the significance of the knight superimposed over the plaid pattern displayed on Appellants' goods was erroneous. Third, they argue on appeal, as they did below, that § 2320 is unconstitutionally vague. Finally, Appellants contend that the district court abused its discretion by denying their motion for a new trial in light of various comments made by the government during the trial. We address these contentions in turn.

A.

Appellants make two arguments regarding the sufficiency of the evidence. First, they contend, as they did in their motion pursuant to Rule 29, that the government's evidence was insufficient to allow the jury to conclude that the mark used on their goods was a counterfeit of the Burberry Check mark. Second, Appellants argue, for the first time on appeal, that the government's evidence was insufficient to allow the jury to find that they had knowledge that the mark displayed on their goods was a counterfeit, as § 2320(a) requires.

Under Rule 29, a district court, "on the defendant's motion[,] must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). We review de novo a district court's denial of a Rule 29 motion, "uphold[ing] a jury verdict if there is substantial evidence, viewed in the light most favor-

able to the [g]overnment, to support it." *United States v. Perkins*, 470 F.3d 150, 160 (4th Cir. 2006). "[S]ubstantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc).

### 1.

Appellants' principal contention as to why the evidence was insufficient to allow a jury to conclude that the mark displayed on their goods was a counterfeit is that it consists of a plaid background and equestrian knight overlay, whereas the Burberry Check mark does not include an equestrian knight. They assert that "[n]o rational jury would conclude that a mark with a knight integrated onto it was a counterfeit of a mark without a knight."[7] Appellants' Br. 23. We disagree,

---

[7]We note that Appellants spend much of their brief contending that the "antidissection rule" required the jury to, as a matter of law, consider their mark as a whole, rather than look at the plaid component of the pattern alone. The antidissection rule instructs that "[c]onflicting composite marks are to be compared by looking at them as a whole, rather than breaking the marks into their component parts for comparison." J. Thomas McCarthy, 4 *McCarthy on Trademarks and Unfair Competition* § 23.41 (4th ed. 2011). A composite mark is one that contains some matter that is descriptive in nature—and, thus, would not alone be registerable as a trademark—used in conjunction with nondescriptive matter. *See Estate of P.D. Beckwith, Inc. v. Comm'r of Patents*, 252 U.S. 538, 541 (1920) (defining "composite marks" as those which "contain both registerable and nonregisterable matter"). It is unclear whether this rule applies to the Burberry Check mark, as it is not a composite. Moreover, Appellants do not cite to—nor have we found—any Supreme Court or Fourth Circuit case that invokes the rule.

Even if the antidissection rule does apply here, however, it would only have bearing on whether the evidence was sufficient to support a conviction if we were to accept Appellants' argument that, viewing their mark as a whole, no reasonable jury could find it was a counterfeit of the Burberry Check mark because of the presence of the equestrian knight. As we explain in this section, we reject this contention. Appellants' mark is simi-

finding that the marks are similar enough to allow a reasonable jury to draw such a conclusion—especially in light of the evidence demonstrating that Burberry often sells goods displaying the Burberry Check mark and the Burberry Equestrian mark together.

A mark does not have to be an exact replica of a registered trademark to be deemed a counterfeit. As stated, § 2320 defines a counterfeit mark as "identical to *or* substantially indistinguishable from" a registered trademark. The Eleventh Circuit has observed that "[t]he legislative history of Section 2320 indicates that . . . 'a mark need not be absolutely identical to a genuine mark in order to be considered counterfeit. Such an interpretation would allow counterfeiters to escape liability by modifying the registered trademarks of their honest competitors in trivial ways.'" *United States v. Guerra*, 293 F.3d 1279, 1288 (11th Cir. 2002) (quoting Joint Statement on Trademark Counterfeiting Legislation, 130 Cong. Rec. 31,675 (1984)). This court has only once held that two marks were so divergent that, as a matter of law, no rational jury could find one was a counterfeit of the other. In a civil counterfeiting case under the Lanham Act,[8] we found that a dog toy

---

lar enough to the Burberry Check mark such that whether it was a counterfeit was a factual issue for the jury to decide. The jury had the opportunity to view both the Burberry Check mark and Appellants' mark in their entirety, and it determined that Appellants' mark was a counterfeit, as it was entitled to do as the finder of fact. Therefore, we find Appellants' argument regarding the antidissection rule lacking in merit.

[8]The Lanham Act defines "counterfeit" as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127. Because of the similarity between this definition and the § 2320 definition of "counterfeit mark," we find Lanham Act civil counterfeiting cases helpful to our analysis of criminal counterfeiting cases brought under § 2320(a). We recognize that the standard may "be construed more narrowly in a criminal context than in a civil context." *Guerra*, 293 F.3d at 1288. *But see* 130 Cong. Rec. 31,675 (stating that the criminal and civil standards are "identical in substance"). Even assuming that the criminal standard is somewhat higher, however, the evidence presented here was sufficient to allow the jury to find the Appellants' mark was a counterfeit.

manufacturer's use of the name "Chewy Vuiton" and a mono-
gram design featuring the letters "CV" was, as a matter of
law, not substantially indistinguishable from the trademarked
"Louis Vuitton" and "LV" designs owned by Louis Vuitton
Malletier. *See Louis Vuitton Malletier S.A. v. Haute Diggity
Dog, LLC*, 507 F.3d 252, 269 (4th Cir. 2007). We based our
decision upon marked differences between the legitimate and
allegedly counterfeit goods, including their distinct names, the
different letters used in the respective monograms, their diver-
gent design and color patterns, and that the allegedly counter-
feit mark was displayed on dog toys, rather than handbags.
*See id.* ("In selling 'Chewy Vuiton' dog toys, Haute Diggity
Dog is not selling knock-off LOUIS VUITTON handbags
with a counterfeit LV mark, and no reasonable trier of fact
could so conclude."). Thus, our case law suggests that a good
displaying an allegedly counterfeit trademark must possess
pronounced differences from a legitimate trademarked good
for us to declare that no rational jury could find that it was a
counterfeit.

Here, viewing the evidence in the light most favorable to
the government, we find that Appellants' mark was similar
enough to the legitimate Burberry mark that we cannot say,
as a matter of law, that no rational jury could conclude Appel-
lants' mark was a counterfeit. We base this holding on the
similarity of the two marks. The plaid pattern displayed on
Appellants' goods differs only slightly from the Burberry
Check mark—in color and in the shape of the boxes formed
by the stripes. Moreover, although the Burberry Check mark
does not include an equestrian knight, it is undisputed that
Burberry has obtained trademark protection for an equestrian
knight mark, and that it often sells handbags and other goods
displaying a combination of the two marks. It is also undis-
puted that Appellants used their mark on handbags—the same
category of goods on which Burberry used its marks. The dis-
trict court was therefore correct to afford the jury the opportu-
nity to view the government's evidence[9] and form an

___

[9]As noted above, the government introduced numerous examples of the
goods seized at Norfolk bearing the allegedly counterfeit mark. It also

independent conclusion regarding whether Appellants' plaid design was substantially indistinguishable from the Burberry Check mark and whether the inclusion of the equestrian knight figure made any difference. *See United States v. Yi*, 460 F.3d 623, 629 n.4 (5th Cir. 2006)(holding that it was for the jury to determine whether a battery that used the signature "Duracell" copper top and black body was a counterfeit, even though the text on the counterfeit battery read "Dinacell"). And this evidence was sufficient to support the jury's finding that Appellants "used a counterfeit mark on or in connection with [intentionally trafficking in] goods and services." *See Habegger*, 370 F.3d at 444.

2.

Appellants next argue that the evidence presented at trial was insufficient to allow a reasonable jury to determine that they had knowledge that the mark displayed on their goods was a counterfeit, as required by § 2320(a). Appellants failed to raise this argument in their Rule 29(c) motion, however, precluding the district court from having the first opportunity to opine on it. When a defendant raises specific grounds in a Rule 29 motion, grounds that are *not* specifically raised are waived on appeal. *See United States v. Stewart*, 129 F. App'x 758, 766 (4th Cir. 2005) (per curiam) (unpublished). Although we have not previously recognized this rule in a published opinion, we join the majority of our sister circuits by stating and adhering to it here. *See, e.g.*, *United States v. Goode*, 483 F.3d 676, 681 (10th Cir. 2007); *United States v. Moore*, 363 F.3d 631, 638 (7th Cir. 2004), *vacated on other grounds*, 543 U.S. 1100 (2005); *United States v. Herrera*, 313 F.3d 882, 884-85 (5th Cir. 2002); *United States v. Quintana-*

introduced examples of handbags displaying the legitimate Burberry Check mark, as well as—of particular significance here—handbags displaying the Burberry Check mark and the Burberry Equestrian mark used in combination.

*Torres*, 235 F.3d 1197, 1199 (9th Cir. 2000); *United States v. Belardo-Quinones*, 71 F.3d 941, 945 (1st Cir. 1995); *United States v. Dandy*, 998 F.2d 1344, 1356-57 (6th Cir. 1993); *United States v. Rivera*, 388 F.2d 545, 548 (2d Cir. 1968); *see also* Charles Alan Wright and Peter J. Henning, 2A *Federal Practice & Procedure* § 469 (4th ed. 2011). We therefore decline to consider Appellants' argument for the first time on appeal.[10]

B.

Appellants next contend that the district court erred when, in response to the jury's question, it instructed the jury to decide for itself whether to consider the knight in determining whether Appellants' mark was a counterfeit. Appellants concede that they did not object to this statement at trial. We therefore review the district court's instruction for plain error. *United States v. Wilson*, 484 F.3d 267, 279 (4th Cir. 2007).

"Under plain error review, Appellants must show that (1) the district court committed error, (2) the error was plain, and (3) the error affected their substantial rights." *Id.* "An error is 'plain' when it is 'obvious or clear under current law.'" *United States v. Brack*, 651 F.3d 388, 392 (4th Cir. 2011) (quoting *United States v. Knight*, 606 F.3d 171, 177 (4th Cir. 2010)). Even if Appellants make such a showing, "[t]he decision to correct the error lies within our discretion, and we exercise that discretion only if the error 'seriously affects the

---

[10]To the extent that an exception to this rule exists in situations in which a "manifest miscarriage of justice" has occurred, *see Quintana-Torres*, 235 F.3d at 1199, this is not such a case. The government presented ample evidence at trial to allow a reasonable jury to conclude that Appellants were aware that the marks on their handbags and wallets were counterfeit, including evidence of: their use of multiple shell companies and multiple ports to import the counterfeit goods, the manner in which they transported and concealed the counterfeit merchandise, the civil lawsuit Burberry instituted against them, and the multiple seizure notices they received from CBP between 2002 and 2005.

fairness, integrity or public reputation of judicial proceedings.'" *Knight*, 606 F.3d at 177-78 (quoting *United States v. Massenburg*, 564 F.3d 337, 343 (4th Cir. 2009)).

Here, Appellants have not met the high standard required to convince us to exercise our discretion. Their only contention as to why the district court's instruction was error is that, as a matter of law, the jury was required to consider the presence of the knight in addition to the plaid pattern when comparing Appellants' goods to those bearing the legitimate Burberry mark. Appellants point to no case law, and we have found none, that supports this proposition. They therefore provide us with no basis on which we could conclude that the district court erred. Even if the district court's instruction was erroneous, however, we cannot say the error was plain unless Appellants establish it was "obvious or clear under current law." *See Brack*, 651 F.3d at 392. Appellants have not met that standard here. Therefore, we decline to afford them relief under plain error review.

## C.

Appellants next contend that § 2320 is unconstitutionally vague. Specifically, they assert that the statute's definition of a "counterfeit mark" as "a spurious mark . . . that is identical with, or substantially indistinguishable from" a mark registered on the principal register in the [USPTO]" does not clearly explain how similar a mark must be for it to be considered counterfeit. Thus, Appellants contend, the statute encourages arbitrary enforcement. "We review challenges to the constitutionality of a statute . . . de novo." *United States v. Hsu*, 364 F.3d 192, 196 (4th Cir. 2004).

For a criminal statute to comply with due process, it must "'provide adequate notice to a person of ordinary intelligence that his contemplated conduct is illegal.'" *Id.* (quoting *Buckley v. Valeo*, 424 U.S. 1, 77 (1976) (per curiam)). This entails "defin[ing] the criminal offense (1) with sufficient definite-

ness that ordinary people can understand what conduct is prohibited and (2) in a manner that does not encourage arbitrary and discriminatory enforcement." *Skilling v. United States*, 130 S. Ct. 2896, 2927 (2010) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). The fact that Congress might have written a statute more clearly does not make that statute unconstitutionally vague. *United States v. Powell*, 423 U.S. 87, 94 (1975). Moreover, "where . . . a criminal statute regulates economic activity, it generally is subject to a less strict vagueness test." *Hsu*, 364 F.3d at 196 (quoting *United States v. Sun*, 278 F.3d 302, 309 (4th Cir. 2002)).

We believe that § 2320 is sufficiently clear to allow an ordinary person to understand what conduct it punishes. Appellants take particular issue with the statute's use of the phrase "substantially indistinguishable" in the definition of a counterfeit mark. We find, however, that considered in its proper context, the meaning of this term is plain. *See Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 191 (4th Cir. 2011) ("[W]e must consider the context in which . . . statutory words are used because '[w]e do not . . . construe statutory phrases in isolation; we read statutes as a whole.'" (quoting *Ayes v. U.S. Dep't of Veterans Affairs*, 473 F.3d 104, 108 (4th Cir. 2006))). For a person's use of a certain mark to be punishable as trafficking in counterfeit goods, the mark must be "spurious," and it must be "identical with, or substantially indistinguishable from" a registered trademark. 18 U.S.C. § 2320(e)(1)(A). *Black's Law Dictionary* defines "spurious" as "[d]eceptively suggesting an erroneous origin; fake." *Black's Law Dictionary* 1533 (9th ed. 2009). In ordinary usage, "substantial" means "[c]onsiderable in importance, value, degree, amount, or extent." *American Heritage Dictionary* 1727 (4th ed. 2006). "Indistinguishable" means "[i]mpossible to differentiate or tell apart." *Id.* at 893. Therefore, the statute, by its plain terms, makes clear that a mark punishable as a counterfeit is one that suggests an erroneous origin and is, to a considerable degree, impossible to distinguish from a legitimate mark. The proximity of the phrase

"substantially indistinguishable" to the term "identical" further emphasizes the degree to which a spurious mark must resemble a legitimate mark for it to be considered a counterfeit. Given the unambiguous nature of the statute's plain language, we conclude that it easily allows an ordinary person to understand what the statute prohibits.

Supporting our conclusion is the fact that the only other circuits to have considered vagueness challenges to § 2320 have similarly rejected such arguments. *See United States v. McEvoy*, 820 F.2d 1170, 1172-73 (11th Cir. 1987) (holding that § 2320, as a whole, is not unconstitutionally vague); *see also United States v. Bohai Trading Co.*, 45 F.3d 577, 580 (1st Cir. 1995) (determining that the phrase "at the time of the manufacture or production," as used in the authorized-use exception to § 2320, is not unconstitutionally vague); *United States v. Gantos*, 817 F.2d 41, 44 (8th Cir. 1987) ("We have considered Gantos' argument[ ] that § 2320 is unconstitutional . . . and find [it] to be without merit."). We find the Eleventh Circuit's observation with regard to this challenge particularly apt:

> The plain meaning of [§ 2320] cannot be seriously disputed. The statute prohibits trafficking in goods where one knowingly uses a counterfeit mark in connection with those goods. A counterfeit is defined as a spurious mark which is used in trafficking, is identical with or substantially indistinguishable from a registered trademark, and is likely to cause confusion, mistake or deception. The act has been applied numerous times in a consistent manner and without any court ever intimating that the act might be unconstitutionally vague.

*McEvoy*, 820 F.2d at 1172-73 (citations omitted). Thus,

Appellants' challenge to the constitutionality of the statute fails.[11]

### D.

Finally, Appellants contend that the district court erred by denying their motion for a new trial pursuant to Rule 33. They claim, as they did before the district court, that a retrial is necessitated by the government's allegedly improper comments at trial. Specifically, Appellants argue that prosecutors, at several points during the trial, misstated the perspective the jury should use when determining whether the mark displayed on their goods was a counterfeit, implying that the jury should consider a hypothetical "average person on the street" rather than using its own judgment. These misstatements, Appellants contend, were so prejudicial that they deprived them of a fair trial.[12]

Rule 33 allows a district court to "[u]pon the defendant's motion, . . . vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Here, the district court agreed that prosecutors had misstated the law and found that such comments were prejudicial. It nevertheless denied Appellants' Rule 33 motion, however, finding that any prejudice was cured by the district court's correct statement of the law and its instructions to the jury to apply the law as stated by the court, not the attorneys. "We review for

---

[11]Although our finding that Appellants fail to meet the first prong of the unconstitutional vagueness test obviates our reaching the second prong, we note that it is disingenuous, in light of the record before us, for Appellants to claim their prosecution was "arbitrary" and the "result of [a] relentless campaign of intimidation by Louis Vuitton, Burberry, and others." Appellants' Br. 37, 39.

[12]Appellants also argue, for the first time on appeal, that the government's statement during closing argument that "a composite mark . . . has nothing to do with this case" was likewise improper. J.A. 1433. They contend that they should be granted a new trial on the basis of this comment. We have considered this argument and find that it lacks merit.

abuse of discretion a district court's denial of a motion for a new trial." *United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003). "A court 'should exercise its discretion to grant a new trial sparingly,' and . . . it should do so 'only when the evidence weighs heavily against the verdict.'" *Id.* (quoting *United States v. Wilson*, 118 F.3d 228, 237 (4th Cir. 1997)).

A prosecutor's statements at trial constitute reversible error only if they were (1) improper and (2) "prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial." *United States v. Chorman*, 910 F.2d 102, 113 (4th Cir. 1990). A number of factors are relevant to the question of whether a defendant's "substantial rights were prejudiced to the point of denying him a fair trial." *Lighty*, 616 F.3d at 361. These factors are:

> (1) the degree to which the prosecutor's remarks ha[d] a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters. We also consider (5) whether the prosecutor's remarks were invited by improper conduct of defense counsel, and (6) whether curative instructions were given to the jury.

*Id.* (citations omitted). These factors should be "examined in the context of the entire trial, and no one factor is dispositive." *Id.*

In light of the district court's comprehensive analysis and the deferential standard of review, we focus on the presence of curative instructions, which formed the basis of the district court's decision.[13] Assuming without deciding that the gov-

---

[13]We note that, as described above, the district court considered the applicable standard with commendable care, making detailed findings

ernment's comments were improper and prejudicial, we find that the district court did not abuse its discretion by concluding that its curative instructions were sufficient to ensure Appellants were afforded a fair trial. As the district court noted, "juries are presumed to follow their instructions." *Richardson v. Marsh*, 481 U.S. 200, 211 (1987); *see also United States v. Francisco*, 35 F.3d 116, 119 (4th Cir. 1994). At trial, the district court instructed the jury twice—including immediately following the government's allegedly improper closing argument—that it was required to apply the law as the district court described it, not as the lawyers stated it. It also provided the jury with lengthy instructions regarding the perspective it was to use when determining whether the plaid used on Appellants' goods was a counterfeit of the Burberry Check mark. It emphasized that the determination was to be based on a "side-by-side comparison [and] use of [their] own eyes." J.A. 1587. It also stated that if the jury "decide[d] the mark [was] not identical or substantially indistinguishable," it must find in favor of Appellants. *Id.* We do not believe it was an abuse of discretion for the district court to presume the jury followed these detailed instructions—a presumption our precedent requires.

Appellants advance no credible arguments to rebut the presumption that the jury followed its instructions here. They cite to no relevant case law in support of their conclusory assertion that "the presence of a curative instruction in a case like

---

regarding each of the six *Lighty* factors. Specifically, it found that the government's remarks were misleading and extensive, and that Appellants did nothing to invite the comments. It also found, however, that the comments were not deliberately made to divert the jury's attention and that the government's evidence, absent the allegedly improper remarks, was strong enough to support Appellants' convictions. The district court finally considered the effect of its curative instructions, concluding they were sufficient to undo any prejudice Appellants may have suffered as a result of the government's comments. Our focus is on this final finding because the district court treated it as determinative.

this one, with so many improper remarks made by the government, is rarely sufficient to cure their prejudicial effect." Appellants' Br. 52. They also claim that the fact that the jury asked a question during deliberations demonstrates that it did not understand the instructions, but they likewise provide no support for this assertion. As such, we conclude that it was well within the district court's discretion to deny Appellants' request for a new trial, particularly given the heightened showing we require of defendants before we will grant the drastic relief of affording them a new trial.

With all due respect to our dissenting colleague, we believe the standard of review—and the fact that the decision to grant a new trial is itself highly discretionary—requires this conclusion. We first note that the dissent spends the majority of its 16 pages focused on advancing two assertions that we have assumed, for the sake of argument, are true: that the prosecution's remarks were improper and that they prejudiced Appellants. Because we assume the validity of both of these conclusions, we take no issue with this portion of the dissent.

In its final three pages, the dissent expresses the view that the district court's instructions to the jury were insufficient to cure the prejudice caused by the government's comments.[14] It

---

[14]In so stating, the dissent cites to *United States v. Wilson*, 135 F.3d 291 (4th Cir. 1998), for the proposition that a "general curative instruction was insufficient to cause the jury to disregard the prosecutor's improper statement." *Ante* at 39-40. In *Wilson*, the prosecution asserted during closing argument that the defendant had committed a murder that was not part of the indicted conduct. 135 F.3d at 297-99. This assertion was not supported by the evidence presented at trial "or any reasonable inference that could be drawn from it" and "came as a last-minute surprise" to the defense. *Id.* In response, the district court did not offer a specific curative instruction, but only "reminded the jury that the defendants were not on trial for charges not alleged in the indictment"—a short time after overruling defense counsel's repeated objections to the murder argument. *Id.* at 302. In these circumstances, we found the "general instruction . . . insufficient." *Id.*

also takes issue with the district court's statement that the jury could consider "other evidence that came into the record" in determining whether the two marks were substantially indistinguishable—in addition to a "side by side comparison" and their "own eyes." J.A. 1587. It further opines that the district court should have explicitly instructed the jury regarding the limited effect of certain testimony. The question before us, however, is not whether we would have instructed the jury differently—as the dissent no doubt would have—because our review is not de novo. Rather, we consider whether the district court abused its discretion. Our review of the record indicates that the district court undertook a thoughtful and comprehensive review of the remarks made by the prosecution, the effect of those comments, and its responses to those comments—which included two instructions to follow the law as stated by the court, and not the lawyers, and specific instructions to the jury to determine whether the marks were substantially indistinguishable by performing a "side by side comparison," by using their "own eyes," and to make the decision on their own. J.A. 1587. Unlike the district court, we do not have the benefit of having witnessed the government's remarks, the jury's reaction to those remarks, or the jury's understanding of the instructions. We therefore decline to hold that the district court's conclusion that its curative instructions had their intended effect and that a new trial was not required in the interest of justice constituted an abuse of discretion.

---

In contrast, the district court here sustained Appellants' objections to the prosecution's improper statements of the law, instructed the jury immediately after the government's closing argument to follow the court's, not the lawyers', instructions regarding what the law required, and subsequently provided detailed instructions regarding how the jury was to apply the law. As such, we do not believe the situation in this case is comparable to that we confronted in *Wilson*. The dissent draws our attention to no other cases that support its assertion that we should find that the curative instruction here failed to cure the prejudice created by the prosecutor's comments.

III.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.

FLOYD, Circuit Judge, concurring in part, dissenting in part, and dissenting from the judgment:

On no fewer than eight occasions during its closing and rebuttal arguments, the government misstated the legal standard governing the key issue disputed by the parties at trial—whether the genuine and allegedly counterfeit marks were "substantially indistinguishable." Six of these misstatements occurred after the district court sustained the first of four defense objections to the remarks. Nevertheless, the district court denied Lam and Chan's Rule 33 motion for a new trial, concluding that, although the statements were prejudicial, the court's curative instruction negated the prejudice. Because I believe that these statements deprived Appellants of a fair trial, and because I think the district court abused its discretion in concluding they did not, I respectfully dissent in part from the majority opinion.

I.

To establish that a defendant has trafficked in counterfeit goods, in violation of 18 U.S.C. § 2320, the government must prove that, in connection with his goods, the defendant used a "spurious mark . . . that is identical with, or substantially indistinguishable from" a registered trademark and that the use of this mark was "likely to cause confusion, to cause mistake, or to deceive." *Id.* § 2320(f)(1)(A). At trial, Lam and Chan did not contest that they engaged in the conduct alleged by the government—that is, that they imported handbags bearing the "Marco mark." Rather, the central issue disputed by the parties was whether Appellants' Marco mark was "sub-

stantially indistinguishable" from the registered Burberry Check mark.

Yet during closing and rebuttal arguments, government counsel repeatedly misstated the standard governing this key issue. He instructed the jurors to assume the perspective of the average consumer who failed to conduct a side-by-side examination of the marks, specifically directing them to adopt the view of two government witnesses in place of their own conclusions regarding the marks. Despite numerous defense objections sustained by the district court, the prosecutor continued to assert this erroneous legal standard.

## A.

Government counsel first addressed the issue of the standard for evaluating whether the marks were substantially indistinguishable in his closing argument. That determination, the prosecutor informed the jury, should be made "from the standpoint of the average purchaser." J.A. at 1426. He went on to tell the jurors that they no longer occupied such a position, stating the following:

> Now, like you all, after spending more than a week in this courtroom, we all probably know a whole lot more about these marks than the average purchaser does. All of us do. I mean, after all, how long do you think an average purchaser spends looking at a mark on a handbag or wallet to determine whether that mark is substantially indistinguishable to a registered mark that they know and remember before deciding to make the purchase or move on to something else? How long do you think they spend? 30 seconds? A minute? It is not going to be a lot of time, certainly not as long as the defendants have asked everyone in the Court to stare and look at them.

*Id.* at 1427.

The prosecutor then urged that, instead of relying on their own examinations of the marks, jurors should adopt the perspective of two government witnesses, Beatrice Bartko and Francis Golden Abel, consumers who had purchased Lam and Chan's handbags believing they were authentic Burberry products. When moving to call Bartko and Abel as witnesses, the government asserted that their testimony would be "relevant to [the] material issue" of "likelihood of confusion," *id.* at 892, and the district court admitted their testimony solely for this purpose, *id.* at 640–41. *See also United States v. Lam*, Action No. 3:07-CR-374, 2010 WL 5178839, at *5 (E.D. Va. Dec. 14, 2010) ("The Government called Bartko and Abel as witnesses for the likelihood of confusion element of the counterfeiting claim only. . . . The Government was not allowed, however, to use these witnesses as evidence that the marks were substantially indistinguishable because they were not called for that purpose.").

As already noted, however, in his closing argument, after cautioning the jurors that they no longer possessed the perspective of an average consumer, the prosecutor told them to "put[ ] [them]selves in the shoes of average purchasers on the street, purchasers like Bea Bartko, purchasers like Fran Abel." J.A. at 1427–28. Bartko and Abel, he recounted, compared the "bag they [were] about to buy with what they remember[ed] . . . of what the genuine mark look[ed] like," without conducting a side-by-side comparison. *Id.* at 1428–29.

At that time, defense counsel did not object to the government's comments. But during his closing argument, Chan's counsel stated that the government was "confus[ing] two issues": whether "the bags confuse somebody if they saw them" and "whether they are substantially indistinguishable or not." *Id.* at 1482. By mingling these issues, defense counsel noted, the government was "get[ting the jury] away from . . . comparing the marks and making [its] own determination" regarding distinguishability. *Id.*

On rebuttal, government counsel once again asserted the jurors should judge whether the marks "are substantially indistinguishable from the perspective of an average person, an average consumer." *Id.* at 1536. Appellants objected to this statement, and the district court sustained the objection. Nevertheless, the government immediately continued, "But what the government suggests, what the government submits, is this: That the evidence has proven that these bags are substantially indistinguishable from authentic marks owned by Burberry and Gucci to the average consumer." *Id.* at 1537. Again, Appellants objected. The district court sustained the objection on the ground that the government was "conflating two issues," but the court instructed the government, "Go ahead and make your argument. I will clear it up." *Id.*

Shortly thereafter, the government again argued that the determination of whether the marks were substantially indistinguishable should be made "from the perspective of the average, ordinary consumer." *Id.* at 1540; *see also id.* ("[T]he test an average consumer."); *id.* at 1541 ("This case is about assessing the evidence from the perspective of an average person, an average consumer."). And the prosecutor further admonished the jury that they—unlike Bartko and Abel—no longer enjoyed that perspective. He stated the following:

> And ladies and gentlemen of the jury, you have a difficult task. You have a difficult task, because you are supposed to assess these facts and look at these Burberry knock-offs . . . from the standpoint of an average consumer. You have been in this case listening to it for a week. You have already developed a level of expertise and a perception of detail that I would argue is way above the average consumer. The average consumer includes people like Beatrice Bartko, someone who was familiar with the Burberry bags from shopping, from seeing it in catalogs, who wanted to add to her collection. She saw a photograph of a Marco bag on the Internet and purchased

it and owned it for a year before determining, before learning that the bag was counterfeit. And she said that she thought it was a Burberry based on the pattern, based on the mark. . . . She thought it was substantially indistinguishable. . . .

Another average consumer, an ordinary consumer, someone who didn't have the benefit of a week-long trial as you have, was Frances Golden Abel. . . . She bought this bag and for some time she thought it was a real Burberry. She did it based on her familiarity with the pattern. . . . She thought this was a real Burberry. That is your evidence of an ordinary consumer. . . . And I submit, the government submits, that this is evidence both of substantially indistinguishable and the likelihood of confusion.

Now, [Chan's defense counsel] in his closing arguments basically said you have to look at the differences. Sure, you do look at the differences. But you start with the similarities. That's what the ordinary consumer does. The ordinary consumer sees things and sees the similarities and is drawn to it based on the similarities. . . . There are so many similarities, they are substantially indistinguishable to the ordinary purchaser.

*Id.* at 1541–43. The district court overruled defense counsels' objection to this statement without explanation. The district court went on to sustain one additional objection to the government's instruction that the jury should "[k]eep [its] eye on the perspective of the average person when [it is] looking at substantially indistinguishable." *Id.* at 1558–59.

In total, the government told the jury to adopt the perspective of the average consumer on no fewer than eight distinct occasions during closing arguments. By my count, six of these comments occurred after the first sustained objection.

The defense entered four objections, three of which the district court sustained. Yet the government carried on in making the erroneous statements and never sought clarification from the district court regarding the nature of its error.

## B.

As the majority notes, the district court provided several instructions that, it concluded, cured the prejudice caused by the government's statements. First, the district court instructed the jurors generally that they should listen to the court, not the lawyers, regarding "what the law is." *Id.* at 1559–60. The district court then directed the jury to determine whether the marks were substantially indistinguishable as follows:

> [Y]ou have to determine whether or not the mark that is alleged to be counterfeit is identical to or substantially indistinguishable from the [registered] mark . . . . Now, in order to carry out your responsibility as it relates to that part of these instructions, you have to compare the marks, the mark . . . alleged to be counterfeit and the mark that is the genuine mark.
>
> Now, you do that and you make a decision. This is based on your side-by-side comparison, use of your own eyes, and any other evidence that came into the record that might help you in that task. But it is for you to decide. . . . If you decide that it is substantially indistinguishable, then you have another task to deal with, and that task has to do with now that you have decided that it is counterfeit under the definition that I have given you, you have to decide whether or not this counterfeit mark is a mark the use of which is likely to cause confusion or cause mistake or to deceive. Everybody understanding that? It is two separate things. Now, a lot of that got

clouded up in some of these arguments and some of the discussion. What must be counterfeit is the mark itself, not the goods.

*Id.* at 1587–88.

The jury found Lam and Chan guilty on all counts relating to the Burberry mark.

## C.

Following their convictions, Lam and Chan filed a motion under Federal Rule of Criminal Procedure 33 seeking a new trial on the ground that the government's improper statements constituted reversible prosecutorial misconduct. The district court concluded that the government's remarks were both improper and prejudicial. *Lam*, 2010 WL 5178839, at *4–9. Nevertheless, it denied Appellants' motion because it found that its instructions to the jury cured this prejudice. *Id.* at *9.

## II.

On appeal, we review the district court's denial of Lam and Chan's motion for a new trial for abuse of discretion. *See United States v. Ibisevic*, No. 11-4151, slip op. at 10 (4th Cir. Mar. 14, 2012). And our review of the district court's factual findings regarding a claim of prosecutorial misconduct is for clear error. *United States v. Ellis*, 121 F.3d 908, 927 (4th Cir. 1997).

"A prosecutor's improper closing argument may 'so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process.'" *United States v. Lighty*, 616 F.3d 321, 359 (4th Cir. 2010) (quoting *United States v. Wilson*, 135 F.3d 291, 297 (4th Cir. 1998)). To determine whether a prosecutor's remarks require reversal, we consider "(1) whether the remarks were, in fact, improper, and, (2) if so, whether the improper remarks so prejudiced the defen-

dant's substantial rights that the defendant was denied a fair trial."[1] *Id.*

---

[1]In setting out the standard for a Rule 33 motion, the district court stated that a court should grant a new trial "only . . . if 'the evidence weighs so heavily against the verdict that it would be unjust to enter judgment.'" *Lam*, 2010 WL 5178839, at *2 (quoting *United States v. Arrington*, 757 F.2d 1484, 1486 (4th Cir. 1985)). The majority, quoting *United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003), repeats this language. *Ante* at 21-22. *Perry*, in turn, is quoting *United States v. Wilson*, 118 F.3d 228, 237 (4th Cir. 1997), which itself quotes *Arrington*. A review of *Wilson* and *Arrington*, however, reveals that they are addressing motions "based on the weight of the evidence," where, of course, the jury verdict should be upheld absent very strong evidence to the contrary. *See Wilson*, 118 F.3d at 237 ("We have held that a district court should exercise its discretion to grant a new trial 'sparingly' and that the district court should grant a new trial *based on the weight of the evidence* 'only when the evidence weighs heavily against the verdict.'" (emphasis added) (quoting *Arrington*, 757 F.2d at 1486)); *Arrington*, 757 F.2d at 1485–86 (considering a Rule 33 motion based on the weight of the evidence). *Perry* involved a Rule 33 motion based on the weight of the evidence and on an inconsistent verdict. *See Perry*, 335 F.3d at 322–23 & n.12.

We have found that a district court abused its discretion in denying a motion for a new trial on other bases without imposing a separate requirement that the defendant demonstrate the evidence weighs heavily against conviction. *See Ibisevic*, slip. op. at 19–21 (finding that the district court abused its discretion denying the defendant's motion for a new trial on the ground of improperly excluded evidence because in applying harmless-error analysis, regardless of whether the government's evidence was sufficient to convict, the court could not say with fair assurance that the error had not substantially swayed the judgment). And, of course, "some constitutional errors . . . are so fundamental and pervasive" that a new trial should be granted without regard for any other facts or circumstances. *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986).

In the context of prosecutorial misconduct, we have held that a defendant may obtain a new trial by demonstrating that the government made improper remarks that prejudicially affected his substantial rights so as to deprive him of a fair trial. *See United States v. Higgs*, 353 F.3d 281, 330 (4th Cir. 2003). Although we have identified the strength of the government's proof absent the improper remarks as one of several factors relevant to the determination of prejudice, we have been careful to note that no single factor is dispositive of the prejudice inquiry. *See Lighty*, 616

## A.

The government first urges that, contrary to the district court's conclusion, its statements were not improper and, as a result, this court need not review the district court's finding with respect to prejudice. I disagree.

The district court found that the prosecutor's remarks were improper in two ways. First, "[t]he [g]overnment's comments regarding the standard for evaluating whether two marks are substantially indistinguishable were erroneous" because, in instructing the jurors that this determination should be made from the perspective of the average consumer, the prosecutor told the jury that they should not rely on their own visual examination to make this factual finding. *Lam*, 2010 WL 5178839, at *5. Second, the government improperly cited Bartko's and Abel's testimony to establish whether an average consumer would find the marks substantially indistinguishable. This testimony, however, could be used to prove

F.3d at 361. Indeed, we have not hesitated to grant a new trial on the basis of prosecutorial misconduct where a defendant has established prejudice, even if the government's case is strong. *See, e.g.*, *Wilson*, 135 F.3d at 302 (remanding for a new trial based on the prosecutor's improper, prejudicial statements despite "fully recognizing that the drug trafficking evidence . . . was strong").

I do not believe that the weight of the evidence becomes a separate, dispositive factor in a Rule 33 motion based on prosecutorial misconduct. Although the Constitution does not guarantee a perfect trial, a defendant is entitled to a fair one. *See Lighty*, 616 F.3d at 336. Where he has been deprived of a fair trial by virtue of a prosecutor's improper remarks causing prejudice, I think our precedent establishes that a new trial is warranted in the interest of justice. It appears that neither the majority nor the district court has, in fact, treated the weight of the evidence as a separate element necessary for the granting of a new trial. Accordingly, I think this statement is properly read to require only that the facts establish the prosecutor's improper statements caused prejudice based on the relevant factors, which include but are not limited to the strength of the government's case.

only the likelihood-of-confusion element, as that was the sole purpose for which these witnesses were called. "Thus, even if an 'average consumer' analysis was relevant to the substantially indistinguishable element, the [g]overnment presented no evidence that the average consumer would have thought the marks were substantially indistinguishable." *Id.* I agree with the district court on both points.

It was clearly within the province of the jury, as fact finder, to decide whether the Marco and Burberry marks were substantially indistinguishable. The government nevertheless argues that its statements were correct in light of *Montres Rolex, S.A. v. Snyder*, 718 F.2d 524 (2d Cir. 1983), and *Pepe (U.K.) Ltd. v. Ocean View Factory Outlet Corp.*, 770 F. Supp. 754 (D.P.R. 1991). *See Montres Rolex*, 718 F.2d at 533 (holding that the determination of whether two marks were substantially indistinguishable should be made from the standpoint of an average purchaser, rather than an expert); *Pepe*, 770 F. Supp. at 758 (discussing *Montres Rolex*). The government failed to recognize, however, that both of these cases arose in the context of civil forfeitures or seizures, without a jury present to make the factual determination. *See Montres Rolex*, 718 F.2d at 527; *Pepe*, 770 F. Supp. at 755–56. And it is clear that the *Montres Rolex* court was not holding that a side-by-side examination of the contested marks was inappropriate, but rather was rejecting a rule that the court must adopt the view of an expert who, aided by specialized knowledge and equipment, is able to identify differences between marks that are not discernible to an average purchaser. *See Montres Rolex*, 718 F.2d at 531 (rejecting a test for the substantially indistinguishable element that depends upon an expert's ability to discern differences "aided by a loupe or microscope" that "would be unnoticed or even undetectable by the average purchaser").

Both the Second Circuit, in *Montres Rolex*, and the District of Puerto Rico, in *Pepe*, conducted visual comparisons of the goods at issue, rather than relying on the views of individuals

who merely recalled the general appearance of the registered trademarks. *See Montres Rolex*, 718 F.2d at 533 ("We examined the actual bracelets at oral argument . . . ."); *Pepe*, 770 F. Supp. at 759 ("Using the 'ocular test' of direct comparison of the defendants' goods with the genuine[,] the Blantor defendants' use of the mark PEPE is use of a counterfeit mark." (citing *Fimab-Finanziaria Maglificio Biellese Fratelli Fila S.p.A. v. Helio Import-Export, Inc.*, 601 F. Supp. 1 (S.D. Fla. 1983)). Use of the "ocular test" is particularly apt where a jury is available to undertake the comparison. Thus, the government erred in instructing the jurors that they should not conduct a visual comparison and that, after hearing evidence at trial, they were no longer positioned to make the requisite factual determination.

In addition, the district court correctly found that the government erred in directing the jury to adopt the views of Bartko and Abel on this issue. The district court allowed these witnesses' testimony because it was relevant to the likelihood-of-confusion issue.[2] Yet the government repeatedly and extensively invoked their testimony for the purpose of establishing that the marks were substantially indistinguishable. This was, as the district court found, improper.

I must next consider the district court's determination regarding whether the improper remarks caused prejudice depriving Lam and Chan of a fair trial.

## B.

We have identified the following factors as relevant to the prejudice inquiry:

---

[2]Likelihood of confusion is properly adjudged from the perspective of the average purchaser based on the conditions encountered in the marketplace, where a close, side-by-side visual inspection of the goods is infeasible. *See* J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:58 (4th ed. 2011).

"(1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters." We also consider (5) whether the prosecutor's remarks were invited by improper conduct of defense counsel, and (6) whether curative instructions were given to the jury.

*Lighty*, 616 F.3d at 361 (citations omitted) (quoting *United States v. Adam*, 70 F.3d 776, 780 (4th Cir. 1995)). No single factor is dispositive. *Id.* Here, the district court found that factors one, two, and five favored granting a new trial; factor three was mixed; and factors four and six favored the government. *See Lam*, 2010 WL 5178839, at *6–11.

I agree with the district court that factor one, the tendency of the prosecutor's remarks to mislead the jury and prejudice the defendant; factor two, the extensiveness of the remarks; and factor five, whether Appellants invited the remarks, favor Lam and Chan. The remarks were highly prejudicial. Whether the marks were substantially indistinguishable was the central issue disputed by the parties at trial. The government not only misstated the relevant legal standard but also suggested that the jurors should adopt the view of government witnesses in place of their own. Accordingly, the government's statements were highly likely to mislead the jury.

Moreover, the remarks were extensive, particularly during the government's rebuttal argument, in which the prosecutor cited the average-consumer standard no fewer than seven times. The prosecutor also spoke at length on two occasions about why he believed the jurors had become too sophisticated to judge the evidence correctly and should, instead, adopt the perspective of Bartko and Abel. The improper

remarks pervaded the government's argument, and the district court correctly found they were extensive. I also agree with the district court that Lam's and Chan's counsel did nothing to invite these remarks.

As to the third factor, the strength of the government's proof absent the remarks, the district court found "that the [g]overnment did not present a wealth of other evidence to prove the substantially indistinguishable element of a counterfeiting charge," but that the government presented some evidence showing that Lam and Chan "knew they were culpable." *Id.* at *8. Although the district court identified only a limited body of evidence of guilt, I accept that this finding was not clearly erroneous.[3]

I do find, however, that the district court clearly erred in concluding that the prosecutor's statements were not deliberate. In my view, factor four must be found to favor Appellants. The district court found that the prosecutor did not deliberately seek to mislead the jury because he genuinely believed that he had set forth the correct standard on the "substantially indistinguishable" element. Where, however, a prosecutor continues to make an incorrect statement of the law after the district court has sustained repeated objections to that statement, notifying the prosecutor of the error, the court should, in my opinion, infer some degree of deliberateness.

---

[3]This finding, of course, is not dispositive. In prior cases, we have not hesitated to order new trials due to improper remarks by prosecutors that cause prejudice, even where the government presented sufficient or strong evidence of guilt. *Wilson*, 135 F.3d at 302 (remanding for a new trial due to the prosecutor's improper and prejudicial statements during closing arguments even while "fully recognizing that the drug trafficking evidence against [the defendant] was strong"); *United States v. Mitchell*, 1 F.3d 235, 242 (4th Cir. 1993) (finding that the prosecution introduced sufficient evidence other than the improper remarks to support a conviction, but nevertheless finding prejudice requiring reversal). Here, the government's case can withstand a sufficiency of the evidence challenge, but it was hardly overwhelming. Indeed, a prior trial of Appellants on these charges resulted in a mistrial due to a hung jury.

To be clear, I do not disturb the district court's finding that, when the prosecutor began to speak, he believed that his statements accurately reflected the law. But a prosecutor's refusal to acknowledge his error after multiple sustained objections should be viewed as deliberate, and a court should deduce from his decision to soldier on a deliberate attempt to mislead the jury.

Likewise, the district court erred in failing to make a separate determination of deliberateness with respect to the prosecutor's references to Bartko's and Abel's testimony. The government based its motion to admit this testimony on its relevance to likelihood of confusion, and the prosecutor's plain disregard of the narrow purpose for which this evidence was admitted further evinces the deliberate nature of his comments.

The district court concluded, after considering the first five factors, that the prosecutor's statements were prejudicial. I agree, but contrary to the district court, I believe that factor four also militates in favor of prejudice.

### C.

Despite finding that the government's remarks were prejudicial, the district court held that its curative instructions were sufficient to cure the prejudice. The majority, too, has treated this factor as determinative. I cannot share their view that the district court's instructions dispelled the prejudice and ensured Lam and Chan received a fair trial.

The district court noted that it provided general curative instructions that the jury should follow the directions of the court, rather than the lawyers, as to the applicable law. In light of the pervasive and highly misleading nature of the prosecutor's comments, I have no difficulty concluding that these general instructions were insufficient to cure the prejudice. *See Wilson*, 135 F.3d at 302 (finding that general curative

instruction was insufficient to cause the jury to disregard the prosecutor's improper statement in that case).

Furthermore, contrary to the district court's finding, I cannot agree that the court's specific instruction on the "substantially indistinguishable" element was sufficient to dissipate the prejudicial effect of the prosecutor's remarks. The district court did tell the jury to compare the allegedly counterfeit mark with the Burberry mark. J.A. at 1587. But it went on to instruct the jury that it should base its determination of this element not only on the jurors' "side-by-side comparison" of the marks, but also on "any other evidence that came into the record." *Id.*

Thus, the district court allowed the jurors to rely on any and all evidence introduced at trial and failed to focus the jurors on the "ocular test." Most notably, at no time did the district court limit the jurors' use of Bartko's and Abel's testimony or instruct them that Bartko and Abel had not conducted the requisite visual comparison of the marks.[4] Nor did the district court disabuse the jurors of the notion that they had gathered too much expertise to make the indistinguishability determination based on their own perceptions.

The district court's instructions, therefore, failed to counter several of the serious errors that the court had identified in the prosecutor's statements. And I do not think that the district court was within the bounds of its proper discretion to find that the limited guidance it provided to the jury was sufficient to counter the strong evidence of prejudice established by the remaining factors.

---

[4]As evidence that its instruction was sufficient to cure the prejudice, the district court cited the fact that the jury convicted Appellants of counterfeiting the Burberry Check mark but not a Gucci trademark. *Lam*, 2010 WL 5178839, at *11. It is notable, then, that Bartko and Abel testified only as to their confusion regarding goods bearing the Burberry mark, and the prosecutor presented and cited no similar evidence regarding the Gucci mark.

## III.

Ultimately, considering all factors relevant to the determination of prejudice, I am compelled to conclude that the government's highly misleading and erroneous statements regarding a central issue disputed at trial prejudiced Lam and Chan, depriving them of the fair trial to which they are entitled. Moreover, I find that the district court abused its discretion in finding that its instructions to the jury cured this prejudice. Accordingly, with all due respect to the district court and my esteemed colleagues, I dissent.